# FALLS CITY INDUSTRIES, INC. *v.* VANCO BEVERAGE, INC.

No. 81–1271.   Argued October 13, 1982—Decided March 22, 1983

430

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Howard Adler, Jr.*, argued the cause for petitioner. With him on the briefs was *Lionel Kestenbaum*.

*Deputy Solicitor General Shapiro* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Baxter, John H. Garvey, Barry Grossman,* and *Nancy C. Garrison.*

*John T. Cusack* argued the cause for respondent. With him on the briefs was *Gordon B. Nash.*

JUSTICE BLACKMUN delivered the opinion of the Court.

Section 2(b) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13(b), provides that a defendant may rebut a prima facie showing of illegal price discrimination by establishing that its lower price to any purchaser or purchasers "was made in good faith to meet an equally low price of a competitor."[1] The United States Court of Appeals for the Seventh Circuit has concluded that the "meeting-competition" defense of § 2(b) is available only if the defendant sets its lower price on a customer-by-customer basis and creates the price discrimination by lowering rather than by raising prices. We conclude that § 2(b) is not so inflexible.

I

From July 1, 1972, through November 30, 1978, petitioner Falls City Industries, Inc., sold beer f.o.b. its Louisville, Ky., brewery to wholesalers throughout Indiana, Kentucky, and 11 other States. Respondent Vanco Beverage, Inc., was the sole wholesale distributor of Falls City beer in Vanderburgh County, Ind. That county includes the city of Evansville. Directly across the state line from Vanderburgh County is Henderson County, Ky., where Falls City's only wholesale distributor was Dawson Springs, Inc. The city of Henderson, Ky., located in Henderson County, is less than 10 miles from Evansville. The two cities are connected by a four-lane interstate highway. The two counties generally are considered to be a single metropolitan area. App. 124.

---

[1] Section 2(b)'s "meeting-competition" proviso reads:

"[N]othing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

Vanco and Dawson Springs each purchased beer from Falls City and other brewers and resold it to retailers in Vanderburgh County and Henderson County, respectively. The two distributors did not compete for sales to the same retailers. This was because Indiana wholesalers were prohibited by state law from selling to out-of-state retailers, Ind. Code § 7.1–3–3–5 (1982), and Indiana retailers were not permitted to purchase beer from out-of-state wholesalers. See § 7.1–3–4–6. Indiana law also affected beer sales in two other ways relevant to this case. First, Indiana required brewers to sell to all Indiana wholesalers at a single price. § 7.1–5–5–7. Second, although it was ignored and virtually unenforced, see Tr. 122–123, 135–136, state law prohibited consumers from importing alcoholic beverages without a permit. § 7.1–5–11–1.

In December 1976, Vanco sued Falls City in the United States District Court for the Southern District of Indiana, alleging, among other things, that Falls City had discriminated in price against Vanco, in violation of § 2(a) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13(a),[2] by charging Vanco a higher price than it charged Dawson Springs. Vanco also claimed that Falls City had violated §§ 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1 and 2, by conspiring with other brewers and unnamed wholesalers to maintain higher prices in Indiana than in Kentucky.

After trial, the District Court dismissed Vanco's Sherman Act claims, finding no evidence to support the allegations of

---

[2] That section provides in relevant part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."

conspiracy or monopolization. 1980–2 Trade Cases ¶ 63,357, pp. 75,809, 75,820. The court held, however, that Vanco had made out a prima facie case of price discrimination under the Robinson-Patman Act. The District Court found that Vanco competed in a geographic market that spanned the state border and included Vanderburgh and Henderson Counties. *Id.*, at 75,813–75,814. Although Vanco and Dawson Springs did not sell to the same retailers, they "competed for sale of [Falls City's] beer to . . . consumers of beer from retailers situated in [that] market area." *Id.*, at 75,814. Falls City charged a higher price for beer sold to Indiana distributors than it charged for the same beer sold to distributors in other States, including Kentucky. *Ibid.*[3] This pricing policy resulted in lower retail prices for Falls City beer in Kentucky than in Indiana, because Kentucky distributors passed on their savings to retailers who in turn passed them on to consumers. Finding that many customers living in the Indiana portion of the geographic market ignored state law to purchase cheaper Falls City beer from Henderson County retailers, the court concluded that Falls City's pricing policies prevented Vanco from competing effectively with Dawson Springs, *id.*, at 75,815–75,816, and caused it to sell less beer to Indiana retailers. *Id.*, at 75,814–75,817, 75,818.[4]

---

[3] Falls City charged Vanco and other Indiana distributors 10–30% more than it charged Dawson Springs and other Kentucky distributors. The District Court concluded that this price differential was not explained by differing costs. Falls City's distributors—wherever located—picked up the beer at Falls City's Louisville brewery. 1980–2 Trade Cases, at 75,814.

[4] The District Court acknowledged that during the period at issue, sales of Falls City beer dropped precipitously throughout Indiana and Kentucky. *Id.*, at 75,815. This decline paralleled a significant nationwide trend that favored national brands of beer and harmed or eliminated many regional brewers like Falls City. See generally, FTC, Staff Report of Bureau of Economics, The Brewing Industry 13–28 (1978). But Vanco's sales of Falls City beer declined more rapidly than did Falls City's sales in Indiana

The District Court rejected Falls City's § 2(b) meeting-competition defense. The court reasoned that, instead of reducing its prices to meet those of a competitor, Falls City had created the price disparity by raising its prices to Indiana wholesalers more than it had raised its Kentucky prices. Instead of "adjusting prices on a customer to customer basis to meet competition from other brewers," *id.*, at 75,822, Falls City charged a single price throughout each State in which it sold beer. The court concluded that Falls City's higher Indiana price was not set in good faith; instead, it was raised "for the sole reason that it followed the other brewers . . . for its profit." *Ibid.*

The United States Court of Appeals for the Seventh Circuit, by a divided vote, affirmed the finding of liability. 654 F. 2d 1224 (1981).[5] The court held that Vanco had established a prima facie case of illegal price discrimination and that Falls City had not demonstrated that the discrimination "was a good faith effort to defend against competitors." *Id.*, at 1230. We granted certiorari to review the Court of Appeals' holdings respecting injury to competition and the "meeting-competition" defense. 455 U. S. 988 (1982).

## II

To establish a prima facie violation of § 2(a), one of the elements a plaintiff must show is a reasonable possibility that a

---

as a whole, or in Henderson County. Moreover, Falls City's rate of decline in Henderson County was less than that in Kentucky as a whole. The District Court found that the difference between Vanco's rate of decline and the rate of decline elsewhere was caused by Falls City's price discrimination. 1980–2 Trade Cases, at 75,815.

[5] The Court of Appeals remanded the case to the District Court for a redetermination of damages because, contrary to our decision in *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U. S. 557 (1981), the District Court had found, 1980–2 Trade Cases, at 75,823, that the aggregate overcharges to Vanco—$575,293.79—were "automatic damage[s]," and had entered judgment for treble that amount. 654 F. 2d, at 1231. The damages issue is not before this Court.

price difference may harm competition. *Corn Products Refining Co.* v. *FTC*, 324 U. S. 726, 742 (1945). In keeping with the Robinson-Patman Act's prophylactic purpose, § 2(a) "does not 'require that the discriminations must in fact have harmed competition.'" *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U. S. 557, 562 (1981), quoting *Corn Products*, 324 U. S., at 742. This reasonable possibility of harm is often referred to as competitive injury. Unless rebutted by one of the Robinson-Patman Act's affirmative defenses, a showing of competitive injury as part of a prima facie case is sufficient to support injunctive relief, and to authorize further inquiry by the courts into whether the plaintiff is entitled to treble damages under § 4 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 15 (1976 ed., Supp. V). *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U. S., at 562.[6]

Falls City contends that the Court of Appeals erred in relying on *FTC* v. *Morton Salt Co.*, 334 U. S. 37 (1948), to uphold the District Court's finding of competitive injury. In *Morton Salt* this Court held that, for the purposes of § 2(a), injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time. 334 U. S., at 46, 50–51; see *id.*, at 60 (Jackson, J., dissenting in part). In the absence of direct evidence of displaced sales, this inference may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits. F. Rowe, Price Discrimination Under the Robinson-Patman Act 182 (1962) (Rowe); see *Chrysler Credit Corp.* v. *J. Truett Payne Co.*, 670 F. 2d 575, 581 (CA5 1982).

---

[6] Section 4 of the Clayton Act requires "some showing of actual injury attributable to something the antitrust laws were designed to prevent." *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U. S., at 562. In this case, the Court of Appeals affirmed the District Court's finding of antitrust injury, 654 F. 2d, at 1230, and that issue is not before us.

According to Falls City, the *Morton Salt* rule should be applied only in cases involving "large buyer preference or seller predation." Brief for Petitioner 31. Falls City does not, however, suggest any economic reason why *Morton Salt*'s "self-evident" inference, 334 U. S., at 50, should not apply when the favored competitor is not extraordinarily large. Although concerns about the excessive market power of large purchasers were primarily responsible for passage of the Robinson-Patman Act, see generally Rowe, at 3–23; U. S. Dept. of Justice, Report on the Robinson-Patman Act 101–139 (1977) (1977 Report), the Act "is of general applicability and prohibits discriminations generally," *FTC* v. *Sun Oil Co.*, 371 U. S. 505, 522 (1963). The determination whether to alter the scope of the Act must be made by Congress, not this Court, as is recognized by the commentators on which Falls City relies. See 1977 Report, at 221–228 and 290–291; ABA Antitrust Section, Monograph No. 4, The Robinson-Patman Act: Policy and Law, Vol. I, 102–103 (1980).

The *Morton Salt* rule was not misapplied in this case. In a strictly literal sense, this case differs from *Morton Salt* because Vanco and Dawson Springs did not compete with each other at the wholesale level; Vanco sold only to Indiana retailers and Dawson Springs sold only to Kentucky retailers. But the competitive injury component of a Robinson-Patman Act violation is not limited to the injury to competition between the favored and the disfavored purchaser; it also encompasses the injury to competition between their customers—in this case the competition between Kentucky retailers and Indiana retailers who, under a District Court finding not challenged in this Court, were selling in a single, interstate retail market.[7]

---

[7] The Court of Appeals upheld the District Court's findings that the sale of Falls City beer to Vanco was in interstate commerce and that Henderson County and Vanderburgh County constituted a unified retail market for beer. *Id.*, at 1227–1229. These holdings are not before us. Falls City does not argue, and never has argued, that "Indiana's consumer-level non-

After observing that Falls City had maintained a substantial price difference between Vanco and Dawson Springs over a significant period of time, the Court of Appeals, like the District Court, considered the evidence that Vanco's loss of Falls City beer sales was attributable to factors other than the price difference, particularly the marketwide decline of Falls City beer. Both courts found it likely that this overall decline accounted for some—or even most—of Vanco's lost sales. Nevertheless, if some of Vanco's injury was attributable to the price discrimination, Falls City is responsible to that extent. See *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134, 144 (1968) (WHITE, J., concurring).

The Court of Appeals agreed with the District Court's findings that "the major reason for the higher Indiana retail beer prices was the higher prices charged Indiana distributors," and "the lower retail prices in Henderson County attracted Indiana customers away from Indiana retailers, thereby causing the retailers to curtail purchases from Vanco." 654 F. 2d, at 1229. These findings were supported by direct evidence of diverted sales,[8] and more than established the com-

---

importation law *compels* a finding that Evansville and Henderson are separate retail beer markets." Reply Brief for Petitioner to Supplemental Brief after Oral Argument 3. Indeed, Falls City's counsel affirmatively waived this argument in a letter written to the District Court before trial, App. to Supplemental Brief for Respondent after Oral Argument. Nor is the broader question whether Indiana and Kentucky constitute separate markets fairly included within the scope of the questions presented in Falls City's petition for certiorari. Counsel for Falls City made this very clear at oral argument, stating that "I'm not asking this Court to delve into the record to second guess that determination by the lower courts." Tr. of Oral Arg. 5–6.

[8] Falls City's own sales agent reported that the different prices charged in the two States accounted—at least in part—for the substantial difference in Vanco's and Dawson Spring's sales performances. App. 97–98, 157, 166. The local press reported substantial purchases of beer in Kentucky by Indiana residents. Tr. 114–122, 128. Kentucky retailers located just south of the Indiana state line on the four-lane highway between

petitive injury required for a prima facie case under § 2(a). See *J. Truett Payne Co.* v. *Chrysler Motors Corp.*, 451 U. S., at 561–562; *Morton Salt*, 334 U. S., at 50–51. We therefore turn to Falls City's "meeting-competition" defense.

## III

When proved, the meeting-competition defense of § 2(b) exonerates a seller from Robinson-Patman Act liability. *Standard Oil Co.* v. *FTC*, 340 U. S. 231, 246–247 (1951). This Court consistently has held that the meeting-competition defense " 'at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor.' " *United States* v. *United States Gypsum Co.*, 438 U. S. 422, 451 (1978), quoting *FTC* v. *A. E. Staley Mfg. Co.*, 324 U. S. 746, 759–760 (1945); see *Great A&P Tea Co.* v. *FTC*, 440 U. S. 69, 82 (1979). The seller must show that under the circumstances it was reasonable to believe that the quoted price or a lower one was available to the favored purchaser or purchasers from the seller's competitors. See *United States Gypsum Co.*, 438 U. S., at 451. Neither the District Court nor the Court of Appeals addressed the question whether Falls City had shown information that would have led a reasonable and prudent person to believe that its lower Kentucky price would meet competitors' equally low prices there; indeed, no findings whatever were made regarding competitors' Kentucky prices, or

---

Evansville and Henderson advertised their low prices extensively in the Evansville media and utilized "drive-in windows" at which customers could purchase beer without leaving their cars. *E. g.*, *id.*, at 336. Witnesses testified that they observed cars with Indiana license plates parked at Henderson County carryout retailers, to which drivers would return carrying cases of beer. *Id.*, at 86–112, 629–632. One Indiana resident testified that he purchased beer in Kentucky because of lower prices there. *Id.*, at 121–122, 218–222, 229. The District Court also relied on the differing rates of decline. See n. 4, *supra*.

the information available to Falls City about its competitors' Kentucky prices.

Instead, the Court of Appeals reasoned that Falls City had otherwise failed to show that its pricing "was a good faith effort" to meet competition. 654 F. 2d, at 1230. The Court of Appeals considered it sufficient to defeat the defense that the price difference "resulted from price increases in Indiana, not price decreases in Kentucky," *ibid.*, and that the higher Indiana price was the result of Falls City's policy of following the Indiana prices of its larger competitors in order to enhance its profits. The Court of Appeals also suggested that Falls City's defense failed because it adopted a "general system of competition," rather than responding to "individual situations." *Ibid.* The court believed that *FTC* v. *A. E. Staley Mfg. Co., supra,* supported this holding. 654 F. 2d, at 1230.

## A

On its face, § 2(b) requires more than a showing of facts that would have led a reasonable person to believe that a lower price was available to the favored purchaser from a competitor. The showing required is that the "lower price . . . *was made* in good faith *to meet*" the competitor's low price. 15 U. S. C. § 13(b) (emphasis added). Thus, the defense requires that the seller offer the lower price in good faith *for the purpose* of meeting the competitor's price, that is, the lower price must actually have been a good-faith response to that competing low price. See Rowe, at 234–235. See generally Kuenzel & Schiffres, Making Sense of Robinson-Patman: The Need to Revitalize Its Affirmative Defenses, 62 Va. L. Rev. 1211, 1237–1255 (1976). In most situations, a showing of facts giving rise to a reasonable belief that equally low prices were available to the favored purchaser from a competitor will be sufficient to establish that the seller's lower price was offered in good faith to meet that price. In others, however, despite the availability from other sellers of a low price, it may be apparent that the defendant's low offer was not a good-faith response.

In *Staley*, this Court applied that principle. The Federal Trade Commission (FTC) had proceeded against Staley and six competing manufacturers of glucose, all of whom adhered to the same Chicago basing-point pricing system. See C. Edwards, Price Discrimination Law 372–379 (1959). See generally FTC Policy Toward Geographic Pricing Practices, 1 CCH Trade Reg. Rep. ¶¶ 3601.27, 3601.40–3601.42, pp. 5346, 5351–5352 (10th ed. 1959). Like its competitors, Staley, whose plant was located in Decatur, Ill., sold glucose to candy and syrup manufacturers at a delivered price that included the freight rate from Chicago to the point of delivery. Purchasers nearer Decatur thus were charged an element of "phantom" freight, while Staley "absorbed" an element of freight in sales to buyers nearer Chicago. 324 U. S., at 749. Customers located near Staley's Decatur plant were harmed because, despite being located closer to the plant, they were forced to pay more for glucose than did their Chicago area competitors. *Id.*, at 756.

The FTC eventually charged all seven manufacturers individually with price discrimination and jointly under the Federal Trade Commission Act with price fixing. See *Corn Products Refining Co.*, 47 F. T. C. 587 (1950). At the time of the *Staley* decision, both the FTC and this Court had determined that use of the pricing system by Staley's competitors was illegal under § 2(a). See *Corn Products Refining Co.* v. *FTC*, 324 U. S., at 732, 737–739. And, although neither the FTC nor this Court directly relied on the fact in finding price discrimination, Staley itself had been found to be a party to an interseller conspiracy aimed at maintaining "oppressive and uniform net delivered prices" throughout the country. See *A. E. Staley Mfg. Co.* v. *FTC*, 4 F. T. C. Stat. & Dec. 795, 805 (1943).

The Court observed that § 2(b) could exonerate Staley only if that section permitted a seller to establish "an otherwise unlawful system of discriminatory prices" in order to benefit from "a like unlawful system maintained by his competitors."

324 U. S., at 753. Staley could not claim that its low Chicago prices were set for the purpose of meeting the equally low prices of competitors there; the Chicago prices could be seen only as part of a collusive pricing system designed to exact artificially high prices throughout the country. Since the low prices were set "in order to establish elsewhere the artificially high prices whose discriminatory effect permeates respondents' entire pricing system," *id.*, at 756, the Court sustained the FTC's finding "that respondents' price discriminations were not made to meet a 'lower' price and consequently were not in good faith," *id.*, at 758.

Thus, even had Staley been able to show that its prices throughout the country did not undercut those of its competitors, its lower price in the Chicago area was not a good-faith response to the lower prices there. Staley had not priced in response to competitors' discrete pricing decisions, but from the outset had followed an industrywide practice of setting its prices according to a single, arbitrary scheme that by its nature *precluded* independent pricing in response to normal competitive forces.

## B

Almost 20 years ago, the FTC set forth the standard that governs the requirement of a "good-faith response":

> "At the heart of Section 2(b) is the concept of 'good faith'. This is a flexible and pragmatic, not a technical or doctrinaire, concept. The standard of good faith is simply the standard of the prudent businessman responding fairly to what he reasonably believes is a situation of competitive necessity." *Continental Baking Co.*, 63 F. T. C. 2071, 2163 (1963).

Whether this standard is met depends on "'the facts and circumstances of the particular case, not abstract theories or remote conjectures.'" *United States* v. *United States Gypsum Co.*, 438 U. S., at 454, quoting *Continental Baking Co.*, 63 F. T. C., at 2163.

The "facts and circumstances" present in *Staley* differ markedly from those present here. Although the District Court characterized the Indiana prices charged by Falls City and its competitors as "artificially high," there is no evidence that Falls City's lower prices in Kentucky were set as part of a plan to obtain artificially high profits in Indiana rather than in response to competitive conditions in Kentucky. Falls City did not adopt an illegal system of prices maintained by its competitors.[9] The District Court found that Falls City's prices rose in Indiana in response to competitors' price increases there; it did not address the crucial question whether Falls City's Kentucky prices remained lower in response to competitors' prices in that State.

Vanco attempts to liken this case to *Staley* by arguing that the existence of industrywide price discrimination within the single geographic retail market itself indicates "tacit or explicit collusion, or . . . market power" inconsistent with a good-faith response. Brief for Respondent 39. By its terms, however, the meeting-competition defense requires a seller to justify only its *lower* price. See *Staley,* 324 U. S., at 753. Thus, although the Sherman Act would provide a remedy if Falls City's higher Indiana price were set collusively, collusion is relevant to Vanco's Robinson-Patman Act claim only if it affected Falls City's lower Kentucky price. If Falls City set its lower price in good faith to meet an equally low price of a competitor, it did not violate the Robinson-Patman Act.

---

[9] Except through its rejected Sherman Act claim, Vanco has never attempted to prove that the competing prices Falls City claims to have met were themselves illegal, or that Falls City met those prices knowing them to be unlawful. The plaintiff bears the burden of proving that the prices met were actually illegal. *Cadigan* v. *Texaco, Inc.,* 492 F. 2d 383, 387 (CA9 1974); *National Dairy Products Corp.* v. *FTC,* 395 F. 2d 517, 524 (CA7), cert. denied, 393 U. S. 977 (1968); see *Standard Oil Co.* v. *Brown,* 238 F. 2d 54, 58, and n. 7 (CA5 1956).

Moreover, the collusion argument founders on a complete lack of proof. Persistent, industrywide price discrimination within a geographic market should certainly alert a court to a substantial possibility of collusion.[10]  See Posner, Oligopoly and the Antitrust Laws: A Suggested Approach, 21 Stan. L. Rev. 1562, 1578–1579 (1969). Here, however, the persistent interstate price difference could well have been attributable, not to Falls City, but to extensive state regulation of the sale of beer. Indiana required each brewer to charge a single price for its beer throughout the State, and barred direct competition between Indiana and Kentucky distributors for sales to retailers. In these unusual circumstances, the prices charged to Vanco and other wholesalers in Vanderburgh County may have been influenced more by market conditions in distant Gary and Fort Wayne than by conditions in nearby Henderson County, Ky. Moreover, wholesalers in Henderson County competed directly, and attempted to price competitively, with wholesalers in neighboring Kentucky counties. App. 52–53. A separate pricing structure might well have evolved in the two States without collusion, not-

---

[10] Indeed, in some circumstances there may be no other plausible explanation for persistent "economic" price discrimination. Cf. *FTC* v. *Cement Institute*, 333 U. S. 683, 715 (1948) ("the multiple basing point system of delivered prices as employed by respondents contravened accepted economic principles and could only have been maintained through collusion"); *Staley*, 324 U. S., at 756 (it "seems inescapable" that basing point system was adopted not to meet equally low prices of competitors, but to establish artificially high prices elsewhere).

"Economic" price discrimination consists in selling a product to different customers at prices that bear different ratios to the marginal costs of sales to those customers, for example, charging the same price to two customers despite the fact that the seller incurs higher costs to serve one than the other, or charging different prices to two customers despite the fact that the seller's costs of service are the same. Price discrimination under the Robinson-Patman Act, however, "is merely a price difference." *FTC* v. *Anheuser-Busch, Inc.*, 363 U. S. 536, 549 (1960).

withstanding the existence of a common retail market along the border. Thus, the sustained price discrimination does not itself demonstrate that Falls City's Kentucky prices were not a good-faith response to competitors' prices there.

### C

The Court of Appeals explicitly relied on two other factors in rejecting Falls City's meeting-competition defense: the price discrimination was created by raising rather than lowering prices, and Falls City raised its prices in order to increase its profits. Neither of these factors is controlling. Nothing in § 2(b) requires a seller to *lower* its price in order to meet competition. On the contrary, § 2(b) requires the defendant to show only that its "lower price . . . was made in good faith to meet an equally low price of a competitor." A seller is required to justify a price difference by showing that it reasonably believed that an equally low price was available to the purchaser and that it offered the lower price for that reason; the seller is not required to show that the difference resulted from subtraction rather than addition.

A different rule would not only be contrary to the language of the statute, but also might stifle the only kind of legitimate price competition reasonably available in particular industries. In a period of generally rising prices, vigorous price competition for a particular customer or customers may take the form of smaller price increases rather than price cuts. Thus, a price discrimination created by selective price increases can result from a good-faith effort to meet a competitor's low price.

Nor is the good faith with which the lower price is offered impugned if the prices raised, like those kept lower, respond to competitors' prices and are set with the goal of increasing the seller's profits. A seller need not choose between "ruinously cutting its prices to all its customers to match the price offered to one, [and] refusing to meet the competition and

then ruinously raising its prices to its remaining customers to cover increased unit costs." *Standard Oil Co.* v. *FTC*, 340 U. S., at 250. Nor need a seller choose between keeping all its prices ruinously low to meet the price offered to one, and ruinously raising its prices to all customers to a level significantly above that charged by its competitors. A seller is permitted "to retain a customer by realistically meeting in good faith the price offered to that customer, without necessarily changing the seller's price to its other customers." *Ibid.* The plain language of § 2(b) also permits a seller to retain a customer by realistically meeting in good faith the price offered to that customer, without necessarily freezing his price to his other customers.

Section 2(b) does not require a seller, meeting in good faith a competitor's lower price to certain customers, to forgo the profits that otherwise would be available in sales to its remaining customers. The very purpose of the defense is to permit a seller to treat different competitive situations differently. The prudent businessman responding fairly to what he believes in good faith is a situation of competitive necessity might well raise his prices to some customers to increase his profits, while meeting competitors' prices by keeping his prices to other customers low.

The Court in *Staley* said that the meeting-competition defense "presupposes that the person charged with violating the Act would, by his normal, non-discriminatory pricing methods, have reached a price so high that he could reduce it in order to meet the competitor's equally low price." 324 U. S., at 754. In that case, however, the Court was not dealing with a seller whose "normal, non-discriminatory pricing methods" called for a price increase but who wished to exempt certain customers from the increase in order to meet prices, lower than the increased price, available to those customers from competitors. Of course, a seller could accomplish the same result within the guidelines the Court of Ap-

peals would impose by instituting across-the-board price increases followed by selective reductions. But far from being flexible and pragmatic, a rule requiring such costly behavior would be nonsensical.[11]

## D

Vanco also contends that Falls City did not satisfy § 2(b) because its price discrimination "was not a *defensive* response to competition." Brief for Respondent 47 (emphasis supplied). According to Vanco, the Robinson-Patman Act permits price discrimination only if its purpose is to retain a customer. *Id.*, at 32–33. We agree that a seller's response must be defensive, in the sense that the lower price must be calculated and offered in good faith to "meet not beat" the competitor's low price. See *United States Gypsum Co.*, 438 U. S., at 454. Section 2(b), however, does not distinguish between one who meets a competitor's lower price to retain an old customer and one who meets a competitor's lower price in an attempt to gain new customers.[12] See Stevens, Defense of Meeting the Lower Price of a Competitor, in Summer Institute on International and Comparative Law, University of Michigan Law School, Lectures on Federal Antitrust Laws 129, 135–136 (1953). Such a distinction would be

---

[11] "Section 2(b) should not require proof that the seller departed from a previously uniform price schedule. Such *previous* pricing is not relevant to evaluation of genuine responses to a *current* competitive situation." Report of the Attorney General's National Committee to Study the Antitrust Laws 182 (1955) (1955 Report) (emphasis in original).

[12] At least three Courts of Appeals have held that the defense is not limited to attempts to retain customers. *Cadigan* v. *Texaco, Inc.*, 492 F. 2d, at 387, and n. 3; *Hanson* v. *Pittsburgh Plate Glass Industries, Inc.*, 482 F. 2d 220, 226–227 (CA5 1973), cert. denied, 414 U. S. 1136 (1974); *Sunshine Biscuits, Inc.* v. *FTC*, 306 F. 2d 48, 51–52 (CA7 1962). But see *Standard Motor Products, Inc.* v. *FTC*, 265 F. 2d 674, 677 (CA2) (defense available only if lower price responds to individual competitive demand), cert. denied, 361 U. S. 826 (1959).

inconsistent with that section's language and logic, see *Sunshine Biscuits, Inc.* v. *FTC*, 306 F. 2d 48, 51–52 (CA7 1962), "would not be in keeping with elementary principles of competition, and would in fact foster tight and rigid commercial relationships by insulating them from market forces." 1955 Report, at 184; see 1977 Report, at 26, 265.[13]

## IV

The Court of Appeals also relied on *Staley* for the proposition that the meeting-competition defense "'places emphasis on individual [competitive] situations, rather than upon a general system of competition,'" 654 F. 2d, at 1230 (quoting *Staley*, 324 U. S., at 753), and "does not justify the maintenance of discriminatory pricing among classes of customers that results merely from the adoption of a competitor's discriminatory pricing structure," 654 F. 2d, at 1230. The Court of Appeals was apparently invoking the District Court's findings that Falls City set prices statewide rather than on a "customer to customer basis," and the District Court's conclusion that this practice disqualified Falls City from asserting the meeting-competition defense. 1980–2 Trade Cases, at 75,817. At least two other Courts of Appeals have read *Staley* to hold that the defense is unavailable to sellers pricing on other than a customer-by-customer basis, while two Courts of Appeals have held that a customer-by-customer response is not required.[14]

---

[13] *Standard Oil Co.* v. *FTC*, 340 U. S. 231 (1951), is not to the contrary. The Court there referred to the defense's being available to a seller seeking to "retain" customers, *id.*, at 242, 249, 250, simply because the petitioner had so framed its defense in that particular case. *Id.*, at 234, 236; see 1955 Report, at 184; Kuenzel & Schiffres, Making Sense of Robinson-Patman: The Need to Revitalize its Affirmative Defenses, 62 Va. L. Rev. 1211, 1253–1254 (1976).

[14] Compare *Exquisite Form Brassiere, Inc.* v. *FTC*, 123 U. S. App. D. C. 358, 359, 360 F. 2d 492, 493 (1965) (customer-by-customer response required), cert. denied, 384 U. S. 959 (1966), and *Standard Motor Products*,

There is no evidence that Congress intended to limit the availability of § 2(b) to customer-specific responses. Section 2(b)'s predecessor, § 2 of the original Clayton Act, stated that "nothing herein contained shall prevent . . . discrimination in price in the same or different communities made in good faith to meet competition." 38 Stat. 730. The Judiciary Committee of the House of Representatives, which drafted the clause that became the current § 2(b), see *Standard Oil Co. v. FTC*, 340 U. S., at 247–248, n. 14, explained the new section's anticipated function: "It should be noted that while the seller is permitted to meet *local* competition, [§ 2(b)] does not permit him to cut *local* prices until his competitor has first offered lower prices, and then he can go no further than to meet those prices." H. R. Rep. No. 2287, 74th Cong., 2d Sess., 16 (1936) (emphasis supplied). Congress intended to allow reasonable pricing responses on an area-specific basis where competitive circumstances warrant them. The purpose of the amendment was to "restric[t] the proviso to price differentials occurring in actual competition." *Standard Oil Co. v. FTC*, 340 U. S., at 242. We conclude that Congress did not intend to bar territorial price differences that are in fact responses to competitive conditions.

Section 2(b) specifically allows a "lower price . . . to any purchaser or purchasers" made in good faith to meet a competitor's equally low price. A single low price surely may be extended to numerous purchasers if the seller has a reasonable basis for believing that the competitor's lower price is available to them.[15] Beyond the requirement that the lower

---

*Inc. v. FTC*, 265 F. 2d, at 677 (same), with *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F. 2d 1014, 1046 (CA9 1981) (customer-by-customer response not necessarily required), cert. denied, 459 U. S. 825 (1982), *Callaway Mills Co. v. FTC*, 362 F. 2d 435, 442 (CA5 1966) (same), and *Balian Ice Cream Co. v. Arden Farms Co.*, 231 F. 2d 356, 366 (CA9 1955) (same), cert. denied, 350 U. S. 991 (1956).

[15] See also *Standard Oil Co. v. FTC*, 340 U. S., at 247, n. 13, quoting statement of Herbert A. Bergson, Assistant Attorney General, at Hear-

price be reasonably calculated to "meet not beat" the competition, Congress intended to leave it a "question of fact . . . whether the way in which the competition was met lies within the latitude allowed." 80 Cong. Rec. 9418 (1936) (remarks of Rep. Utterback). Once again, this inquiry is guided by the standard of the prudent businessman responding fairly to what he reasonably believes are the competitive necessities.

A seller may have good reason to believe that a competitor or competitors are charging lower prices throughout a particular region. See *William Inglis & Sons Baking Co.* v. *ITT Continental Baking Co.*, 668 F. 2d 1014, 1046 (CA9 1981), cert. denied, 459 U. S. 825 (1982); *Balian Ice Cream Co.* v. *Arden Farms Co.*, 231 F. 2d 356, 366 (CA9 1955), cert. denied, 350 U. S. 991 (1956); Rowe, at 235–236. In such circumstances, customer-by-customer negotiations would be unlikely to result in prices different from those set according to information relating to competitors' territorial prices. A customer-by-customer requirement might also make meaningful price competition unrealistically expensive for smaller firms such as Falls City, which was attempting to compete with larger national breweries in 13 separate States. Cf. *Callaway Mills Co.* v. *FTC*, 362 F. 2d 435, 442 (CA5 1966) (in some circumstances, requirement of customer-by-customer pricing "would be burdensome, unreasonable, and practically unfeasible").

In *Staley*, 324 U. S., at 753, as in each of the later cases in which this Court has contrasted a "general system of competition" with "individual competitive situations," see, *e. g.*, *FTC* v. *National Lead Co.*, 352 U. S. 419, 431 (1957); *FTC* v. *Cement Institute*, 333 U. S. 683, 708 (1948), the seller's lower

_____

ings on S. 236 before a Subcommittee of the Senate Committee on Interstate and Foreign Commerce, 81st Cong., 1st Sess., 77 (1949) (" 'The section presently permits sellers to justify otherwise forbidden price discriminations on the ground that the lower prices to one set of buyers were made in good faith to meet the equally low prices of a competitor' ").

price was quoted not *"because* of lower prices by a competitor,"* but *"because* of a preconceived pricing scale which [was] operative regardless of variations in competitor's prices." Rowe, at 234 (emphasis in original). In those cases, the contested lower prices were not truly *"responsive* to rivals' competitive prices," *ibid.* (emphasis in original), and therefore were not genuinely made to meet competitors' lower prices. Territorial pricing, however, can be a perfectly reasonable method—sometimes the most reasonable method—of responding to rivals' low prices.[16] We choose not to read into § 2(b) a restriction that would deny the meeting-competition defense to one whose areawide price is a well-tailored response to competitors' low prices.

Of course, a seller must limit its lower price to that group of customers reasonably believed to have the lower price available to it from competitors. A response that is not reasonably tailored to the competitive situation as known to the seller, or one that is based on inadequate verification, would not meet the standard of good faith. Similarly, the response may continue only as long as the competitive circumstances justifying it, as reasonably known by the seller, persist.[17] One choosing to price on a territorial basis, rather than on a

---

[16] See Rowe, at 240 ("a seller's area-wide and blanket lower price, if made in good faith to meet competitors' lower prices, may be justified . . . as responsive to an 'individual competitive situation'"). Cf. *Maryland Baking Co.* v. *FTC*, 243 F. 2d 716, 719 (CA4 1957) (FTC permits competitive area price variations to avert placing "prices in a straightjacket throughout the country"); *Anheuser-Busch, Inc.*, 54 F. T. C. 277, 301 (1957) (suggesting that offer of lower price throughout particular area might be responsive to "individual competitive situation"); *C. E. Niehoff & Co.*, 51 F. T. C. 1114, 1130, 1146 (1955) (rejecting position that "showing that the seller's discriminations were temporary and localized in area is an indispensable prerequisite" to defense).

[17] See Klein, Meeting Competition by Price Systems Under § 2(b) of the Robinson-Patman Act: Problems and Prospects, 16 Antitrust Bull. 213, 233–234, 238 (1971); Kuenzel & Schiffres, 62 Va. L. Rev., at 1244–1249.

customer-by-customer basis, must show that this decision was a genuine, reasonable response to prevailing competitive circumstances. See *International Air Industries, Inc.* v. *American Excelsior Co.*, 517 F. 2d 714, 725–726 (CA5 1975), cert. denied, 424 U. S. 943 (1976); *Callaway Mills Co.* v. *FTC*, 362 F. 2d, at 441–442. See generally 1977 Report, at 265. Unless the circumstances call into question the seller's good faith, this burden will be discharged by showing that a reasonable and prudent businessman would believe that the lower price he charged was generally available from his competitors throughout the territory and throughout the period in which he made the lower price available. See *William Inglis & Sons Baking Co.* v. *ITT Continental Baking Co.*, 668 F. 2d, at 1045–1046.

V

In summary, the meeting-competition defense requires the seller at least to show the existence of facts that would lead a reasonable and prudent person to believe that the seller's lower price would meet the equally low price of a competitor; it also requires the seller to demonstrate that its lower price was a good-faith response to a competitor's lower price.

Falls City contends that it has established its meeting-competition defense as a matter of law. In the absence of further findings, we do not agree. The District Court and the Court of Appeals did not decide whether Falls City had shown facts that would have led a reasonable and prudent person to conclude that its lower price would meet the equally low price of its competitors in Kentucky throughout the period at issue in this suit. Nor did they apply the proper standards to the question whether Falls City's decision to set a single statewide price in Kentucky was a good-faith, well-tailored response to the competitive circumstances prevailing there. The absence of allegations to the contrary is not controlling; the statute places the burden of establishing the defense on Falls City, not Vanco. There is evidence

in the record that might support an inference that these requirements were met,[18] but whether to draw that inference is a question for the trier of fact, not this Court.

Accordingly, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[18] Were the courts below to find that Falls City reasonably believed that low prices were available to Dawson Springs and other Kentucky wholesalers from Falls City's competitors, a factfinding that we decline to address on this record, Falls City could not easily have eliminated price discrimination between Dawson Springs and Vanco. In such circumstances, had Falls City raised prices in Kentucky in lockstep with price increases in Indiana, it would have lost sales in Kentucky because its competitors would have been offering far lower prices. Raising its Kentucky prices only in Henderson County would not only have cost Falls City sales there, but also might have exposed Falls City to new Robinson-Patman Act claims, since Dawson Springs competed for sales with wholesalers in neighboring Kentucky counties. Nor, in such circumstances, could Falls City reasonably be required to charge Vanco the lower Kentucky price. Indiana law prohibited Falls City from doing so without simultaneously offering the same price to all other Indiana wholesalers. This approach might well have harmed Falls City's economic interests, since most of Falls City's Indiana sales were in areas far removed from lower Kentucky prices and competition.