**BEST BRANDS BEVERAGE, INC., Plaintiff,**

v.

**FALSTAFF BREWING CORP., Pearl Brewing Co., Defendants.**

No. 85 Civ. 3661 (RO).

United States District Court, S.D. New York.

Oct. 2, 1985.

Stroock & Stroock & Lavan, New York City (Alvin K. Hellerstein, Steven A. Rosen, of counsel), for plaintiff.

Kramer, Levin, Nessen, Kamin & Frankel, New York City (Robert M. Heller, Arthur H. Aufses, John Chapman, of counsel), for defendants.

## OPINION AND ORDER

OWEN, District Judge.

For several years, Best Brands has been the exclusive distributor of Falstaff beer products in a number of eastern states including New York. Believing itself threatened by what it views as astonishing and discriminatory price hikes by the brewer and by a secret and sudden loss of territorial exclusivity, Best Brands moves for a preliminary injunction in two main areas. First, it seeks to roll back prices charged it by Falstaff to those existing prior to November of 1984, noting that the questioned subsequent increases were not imposed on any other distributor nationwide. Second, it seeks to enjoin shipments to the new "dual master distributor", Consolidated Beverage Corporation, a company with a history of prior business failures [1]

clandestinely appointed to distribute Falstaff products in areas heretofore served exclusively by Best Brands, noting that no other such dual master distributorship has ever existed heretofore.

For reasons that follow, based on a showing of violations of contract and antitrust law, I grant Best Brands' motion for a preliminary injunction and deny Falstaff's application for a rehearing on a prior finding of contempt for violation of this court's temporary retraining order. [2]

Since 1982, the parties have been dealing under the explicit and implicit terms of a master distributorship arrangement. Best Brands has been the exclusive distributor of Falstaff's Ballantine Ale and Haffenreffer Private Stock in a territory which, though initially limited to New York, now extends to Virginia. The course of dealing has reflected the exclusivity of territory and preferential pricing in return for Best Brands' investment of money and effort to build a market for a hitherto moribund product (Ballantine Ale) and an unknown one (Haffenreffer Private Stock). David Tye, President of Best Brands, testified that he made his exclusivity deal with one Jack Miller, now deceased, but formerly Vice Chairman of Falstaff; that it was a permanent arrangement, only cancellable "if I didn't do a good job." Lutz Issleib, a current Falstaff Vice President, acknowl-

---

1. These include recent delinquencies as a subdistributor of Best Brands itself. See Best Brands' letter to Consolidated dated October 24, 1984 which in part reads as follows:

   For sometime now, the Chemical Bank Factoring Division, to whom we assign our accounts receivable, has expressed to us their concern and displeasure at the fact that your Company's [Consolidated's] payments of our invoices, for goods sold and delivered, have been delinquent.

   As we have explained to you, it is our business custom to assign our accounts receivables to Chemical Bank, who then collects payment of same. On several occasions, Chemical Bank has contacted us to state they do not wish to continue to act in such a capacity with respect to your account, because of your delinquency in payment, and the attendant inconvenience to them resulting therefrom.

2. On May 15, 1985, being completely unaware of any proposed second master distributor, I ordered in general terms that defendants Fal-

staff and Pearl not "discriminate" or "interfere" with Best Brands' exclusive distributorship. Upon learning of the commencement of shipments to Consolidated some five or more days after the order, I ruled those shipments to be a violation of the order. The circumstances surrounding these shipments as thereafter developed in depositions lends further support to the determination of contempt. Notwithstanding that Consolidated had been told by defendants in April that it must have a letter of credit before Falstaff would ship, defendants, after the Court's order, without advising the Court, and without waiting for the letter of credit, commenced shipping, justifying their shipments on the theory that they were in possession of some of Consolidated's blank checks. They even made the first shipment without ascertaining whether there were funds in the bank to cover the checks—and it turned out there were not.

edged at his deposition that such deals are frequently made on the basis of a handshake, and subsequent documentation supports Best Brands' contention that it operated as exclusive master distributor with preferential pricing:

1) A Falstaff document entitled "Exclusive Master Distributor Report" dated June 1, 1982, sets out the New York territory in which Best Brands was to begin operation as "exclusive master distributor" on behalf of Falstaff. Falstaff has not denied that it titled and signed that document.

2) A letter dated March 31, 1983 from Clifford Lincoln (Falstaff's national sales manager) discussing a previous price increase and its effect on Best Brands' preferential pricing guarantee reads:

... Keep in mind when you discuss your F.O.B's with anyone, yours are the lowest in the East and have been with the concept of the mastering.

Indeed, several Falstaff executives stated at depositions that mastering is always exclusive. None had ever heard of the concept of "dual mastering" before the present dispute. Earl Thompson, until recently plant manager of Falstaff's brewery at Fort Wayne, Indiana, stated:

Q. In your 33 years at Falstaff, have you ever before heard of two master wholesalers for one state?

A. Two master wholesalers—

* * * * * *

Q. Have you ever had dual master's [sic] before?

A. I said I did not recall such.

Best Brands' business relationship with Falstaff has been quite successful. Its territory has been repeatedly enlarged (the last time, as recently as January 1984), the record contains a number of congratulatory letters expressing Falstaff's satisfaction and Falstaff executives' confirm that Best Brands is a major source of Falstaff's income. Issleib stated:

Q. Have you been satisfied with Best Brands' sales results over the course of the last year?

* * * * * *

A. Are you talking about volume?

Q. Yes.

A. Case volume, certainly.

Q. Have you discussed Best Brands' sales volume with other people in Falstaff management over the last year?

A. Yes, Carl Mullen.

Q. Has Carl Mullen expressed satisfaction to you with Best Brands' sales volume during the last year?

A. Definitely.

Q. Have you ever heard anyone at Falstaff complain about Best Brands' sales volume, during the last year?

* * * * * *

A. Not to my recollection, no.

Q. Have you discussed Best Brands' sales volume over the last year with anyone else at Falstaff?

* * * * * *

A. Dave Kaiser, Earl Thompson, Val Picket.

* * * * * *

Q. What was the substance of your discussions concerning Best Brands' sales volume with Dave Kaiser?

A. Well, with all three of them it is just one general discussion, how happy I was with the sales that were being shipped to Best Brands, the volume.

Q. Why were you happy?

A. Well, if you ship a volume, the brewery makes money, obviously.

Q. So, the brewery has been making money as a result of [shipments to Best Brands].

A. That's public information.

Thompson stated:

Q. Could you identify the largest customer of the Fort Wayne, Indiana brewery?

A. Today?

Q. Yes.

A. Recently, I would say Best Brands, New York.

* * * * * *

Q. Which of Falstaff's customers purchased the largest volume of Falstaff products?

A. That would be Best Brands.

Q. Has that been the case for the last—since the beginning of 1984?

A. I can't speak for '85, but I can speak for '84. That's a true fact ...

\* \* \* \* \* \*

Q. Can you describe what you know of Best Brands' effort to promote sales of Falstaff products?

\* \* \* \* \* \*

A. I just know the cases he sold in 1984, he sold most cases as far as a single distributor, for Falstaff.

\* \* \* \* \* \*

Q. Have sales of Falstaff products grown as a consequence of Best Brands' master distributorship?

\* \* \* \* \* \*

A. When you say Falstaff, are you talking about Ballantine Ale and Haffenreffer?

Q. Focusing on those two, yes.

A. According to this schedule [Plaintiff's Ex. 28], it is yes.

Notwithstanding this success, the relationship between the parties went into an abrupt decline in the late fall of 1984 when the first of the contested price rises were imposed on Best Brands alone of all Falstaff master distributors. Beverly Miller, a Falstaff sales administrator testified:

Q. How about Haffenreffer Private Stock, are you aware of any price increases for Haffenreffer Private Stock Malt Liquor imposed on any distributors since October 1984?

\* \* \* \* \* \*

Are these price increases indicated on these price sheets only prices imposed on Best Brands?

A. That is what it shows at the top.

Q. Are you aware of whether similar price increases for Haffenreffer Private Stock were imposed on any of the other distributors at the same time?

A. Not to my knowledge.

Q. The documents that you have produced don't reflect any price increases on any other distributors, do they?

A. No.

\* \* \* \* \* \*

Q. Are you aware of any price increases that were imposed for Ballantine Ale since October 1984, and please refer to Exhibit 1?

A. They are in there.

\* \* \* \* \* \*

Q. Are you aware of any price increases for Ballantine Ale imposed on any master distributor other than Best Brands since October 1984?

A. No.

The price increases do not appear to have been the result of business judgment. An explanation which the record does support, however, is that they were personally ordered by Falstaff's Chairman of the Board, Paul Kalmanovitz, to retaliate against David Tye, President of Best Brands, and his brother Raymond Tye. In this regard, Issleib testified:

Q. So the increases were not imposed on any distributors other than Best Brands, that you are aware of?

A. Yes, they weren't.

Q. They were not.

Why did you tell Ms. Miller to raise prices only in Best Brands' states?

A. Following instructions.

Q. Were those the instructions of Mr. Orsi?

A. Mr. Orsi, and I assume, from Mr. Kalmanovitz, via Mr. Orsi.

Q. Did you ask either Mr. Kalmanovitz or Mr. Orsi why the price increases were being imposed only on Best Brands?

A. No. I just followed orders.

Q. Did they tell you why the price increases, did either Mr. Kalmanovitz or Mr. Orsi tell you why the price increase was only being imposed on Best Brands?

A. Not really. I didn't ask. I just followed orders and executed.

\* \* \* \* \* \*

Q. Did you ask [Mr. Kalmanovitz] why the increase would be limited to Best Brands?

A. You don't ask Mr. Kalmanovitz why he does something. You just do it.

Falstaff's power is clearly centralized in Kalmanovitz. It is he who makes market and price policy, and controls distributorship. As to Best Brands, Kalmanovitz assumed total control over price increases and distributor appointments in Best Brands' territory. Kalmanovitz's stand vis-a-vis Best Brands perplexed even those within his organization. The testimony of Issleib contains more than a suggestion that the attacks on Best Brands were and are attributable to Kalmanovitz' desire to personally retaliate against the Tye brothers for their failure to help him settle some unrelated litigation against Falstaff by a third party.[3]

In any event, and whatever the reason, in the winter and spring of 1984-5, Kalmanovitz apparently began the process of supplanting Best Brands. He ordered unprecedented unilateral price increases be imposed upon it. Next, unknown to Best Brands, he offered Albert Thompson, President of Consolidated Beverages, a dual

---

3. Q. Do you recall any explanation given to you by Mr. Mullen for the price increases imposed on Best Brands?
   A. He didn't give me one.
   Q. He never gave you one?
   A. No.
   Q. Did he [Mr. Mullen] ever mention to you a dispute between Mr. Kalmanovitz and A. Raymond Tye?

   \* \* \* \* \* \*

   A. Certainly.
   Q. What did he tell you about that?
   A. I believe that he was involved in—to my best knowledge, he was involved in a dispute with Mr. Tye, Mr. Raymond Tye and Mr. Kalmanovitz, which was basically Mr. Ray Tye, was to help settle a legal dispute with a Considine Distributing. I don't know if he owned that at that point or not, or whether he ever owned it, and there were suits filed against Falstaff, and evidently he never settled it, or he was never active in the settlement of it.
   Q. Did Mr. Mullen tell you anything else about the dispute between Mr. Kalmanovitz and Mr. Tye?
   A. Only the fact that nothing had been settled, and that Paul [Kalmanovitz] was very upset with Mr. Tye, and the fact that he had gotten Raymond Tye and David Tye mixed up, and he [Mullen] was obliged to tell him [Kalmanovitz] they were not the same people.
   Q. Mr. Mullen was trying to tell Mr. Kalmanovitz they were not the same people?
   A. Yes, that they were brothers, that they were not one and the same.

   \* \* \* \* \* \*

   Q. Is there anything more Mr. Mullen told you about how upset Mr. Kalmanovitz was?

   \* \* \* \* \* \*

   Q. Did you ever discuss that dispute with Mr. Kalmanovitz, directly?
   A. Vaguely.
   Q. What time?
   A. Must have been sometime this spring.
   Q. Spring this year [1985]?
   A. Yes.
   Q. What did he tell you about it?
   A. He was very upset with David and Ray Tye.
   Q. Did he tell you why he was upset with them?
   A. Because they had not performed an obligation that he was expecting them to do, and which goes back to settling of Considine affair.
   Q. Do you recall when, in the spring, this discussion took place?
   A. Not really....

   \* \* \* \* \* \*

   Q. Did he tell you any more precisely, what he considered to be the obligations of the Tyes?
   A. He felt that Mr. Raymond Tye had pledged to settle this litigation with Considine in Massachusetts, and that he had not performed as expected, and he was just very upset....

   \* \* \* \* \* \*

   Q. Did he ever tell you that he wanted to retaliate against the Tyes for their failure to settle the Considine litigation?

   \* \* \* \* \* \*

   A. He said he was very upset with them, and retaliate—I don't remember that word being used, but—
   Q. What words do you remember?
   A. Just that he was very upset with them.
   Q. Did he say what he intended to do, if anything, as a result?
   A. Not in detail, I'd just have to speculate on it.
   MR. AUFSES: No, just testify to what you remember him saying.
   A. I'm not going to speculate. I don't remember the detail of that. Frankly, I wanted to stay ... I wanted to stay away from it.

master distributorship for Best Brands' New York area on the premise of appointing a "minority" distributor for improved promotion in the minority areas, but with the expectation of Consolidated eventually having total territory coextensive with that now held exclusively by Best Brands. But this heretofore unsuccessful and unreliable wholesaler was an unlikely candidate to allegedly remedy Best Brands' claimed shortcoming, see *supra,* [4] and the unusual price increases imposed for the territory put overall sales in major jeopardy, see *infra.*

Even were the facts surrounding Consolidated's appointment less questionable, the business justification would still be absent. Falstaff had no reason to complain of Best Brands's efforts, and it did not do so. Dual mastering could only interfere with the present business relationship and discourage zealous promotion. And when the series of recent price increases are also considered, it appears that Kalmanovitz was and is more interested in injury to Best Brands than the profits of Falstaff, his own corporation. The unusual price hikes, as much as $1.00 per case at a time, caused even Kalmanovitz's own Falstaff executives to speculate on the risk of harm to themselves. David Kaiser, Falstaff's Controller, testified:

Q. Did you think the [Best Brands] price increases would hurt your sales?

\* \* \* \* \* \*

A. Yes.

\* \* \* \* \* \*

4. Not only Kalmanovitz's choice of a dual master, but also the manner in which it came to pass suggest the absence of good faith. If indeed, after Best Brands' successes, see *supra,* Falstaff truly felt there were problems, one would have expected the parties to meet to discuss their resolution. Instead of that there was the secret appointment of Consolidated in violation of Best Brands' exclusive mastering agreement. Also illuminating is Kalmanovitz's insistence on shipping to Consolidated notwithstanding this court's order and demoting a plant manager who, knowing of this Court's order, refused to ship. Kalmanovitz's letter reads:

May 23, 1985

Q. Did you discuss with anyone whether it would be advisable for you to express your concern about the possible effect on sales of the price increases, to senior management?

A. Yes, I think I did.

Q. Who did you discuss that with?

A. Beverly, to the best of my knowledge.

Q. Anyone else?

\* \* \* \* \* \*

A. Well, I basically asked her if—to the best of my knowledge, that other— once these price increases were established, whether we could still have enough business to keep open, I guess.

\* \* \* \* \* \*

Q. You testified, yesterday, about your concern that sales to Best Brands might be effected by the price increases imposed on Best Brands. Are you also concerned that Falstaff's profits from such sales might decline?

A. Yes. Yes, I'm concerned about profits. That's my job. I'm concerned about many things.

Q. Are you concerned that the profits might decline as a result of the price increases imposed on Best Brands?

A. Yes.

Earl Thompson, the demoted Falstaff plant manager, see *supra* testified:

Q. Did Mr. Kaiser express any concern to you that the price increases would hurt Falstaff's business?

A. He has expressed that, yes. I just testified to that.

Mr. Earl Thompson
Falstaff Brewing Corporation
1025 Grant Avenue
Ft. Wayne, Indiana 46803
Dear Mr. Thompson:
    You are hereby notified that effective immediately you are removed from the position of Plant Manager.
    This action is taken as a result of your refusal to ship beer to Consolidated Beverage.
    Mr. Val Pickett will become Plant Manager effective immediately.
        /s/
        Paul Kalmanovitz

Q. Has he expressed that on more than one occasion?

A. Yes.

\* \* \* \* \* \*

Q. Did you expect the price increases to reduce the demand for the product?

A. Did I expect it—yes.

Mr. Issleib was also concerned about the unusual price increases. He knew that ill-considered prior Pearl Brewery price rises had irrevocably alienated customers, and permanently lost business.[5]

Q. What was your concern about the effect on the volume of the [Best Brands May 1985] price increases?

A. That it would have a detrimental effect on the volume. Obviously, if you go up, there is only so much that the market-place might bear.

\* \* \* \* \* \*

Q. During the last 18 years [that you've been in the beer industry], have you ever seen price increases imposed which had the effect of reducing sales?

A. Well, Certainly.

Q. Have the price increases been rescinded as a consequence, in any of those instances?

A. Yes.

Q. Can you give me an example?

A. The dates might be off, but Pearl Brewing Company put in a price increase [for Pearl Beer] back in '75 or '76 that they rescinded because of the adverse effect on the volume, and they found out they put the product in the wrong pricing structure. So, at that point, consumer demand deteriorated, and we found out at Pearl that that product was very price sensitive.

\* \* \* \* \* \*

Q. Was the price increase for Pearl Beer rescinded as a consequence of the decline in sales volume?

A. Yes.

Q. Did Pearl recover its lost volume?

A. [Only] some of it.

Barry Kanner, President of Southland Distributors, the Falstaff master distributor in the territory just south of Best Brands, was questioned as to the potential effect of such price hikes:

Q. What generally has been the per-case price increase imposed by Falstaff Brewing Corporation on Southland Distributing Company for Haffenreffer Private Stock over the past five years on a per-price increase basis?

A. I would say that they would have varied between twenty and forty cents, approximately.

\* \* \* \* \* \*

Q. Mr. Kanner, are you aware that since December, 1984 to date, Falstaff Brewing Corporation has raised its prices to Best Brands Beverage, Inc. for purchases of Private Stock, of Haffenreffer Private Stock in excess of one dollar per case for cans and bottles of every size?

A. I have become aware of that, yes.

\* \* \* \* \* \*

Q. What effect on the business of Southland Distributing Company would be a per-case price increase in excess of one dollar have for purchases of Haffenreffer Private Stock?

A. I'm sure that it would—it would hurt sales. That's—in our industry, every time a price is increased you always run a risk of hurting sales. So that would be my concern with an increase of that size.

Q. Would you relate that to a percentage of sales for me?

A. My guess would be that it's very conceivable you would lose fifty percent of your sales.

Q. Would that be at least fifty percent?

A. I would say that's very possible, yes.

Q. Do you have every reason to believe that would be the case?

5. The entire industry has an awareness of Schaefer beer's never-recovered sales losses following an ill-conceived price rise.

A. Certainly.

\* \* \* \* \* \*

Q. What effect on Southland Distributing Company would a fifty percent reduction in over-all sales of Southland Distributing Company have?

A. It would obviously reduce our income probably by an equivalent amount, and it would certainly make me very concerned about the viability of my company.

In addition, with such large differences in prices, the risk of transshipment of beer from a low-price state to a high-price state to undersell local wholesalers is quite real even in these days when some states have "deposit" requirements. Indeed, even Thompson of Consolidated, Falstaff's would-be dual master distributor in New York testified as follows:

Q. Have you heard of the term "transshipment"?

A. Sure.

Q. What is that?

A. That's when people send beer out of their territory.

Q. Is that prevalent?

A. Yes.

Q. As part of the competition that you face?

A. Yes.

\* \* \* \* \* \*

Q. Incidentally, you were talking about trans-shipments by other companies within New York State to you. You don't know where those other companies got the beer they transshipped into your area, do you?

\* \* \* \* \* \*

A. Well, he is a Falstaff representative.

\* \* \* \* \* \*

Q. But if that distributor wanted to buy beer, that he could get cheaper from somewhere else, you wouldn't know if he did it or not?

\* \* \* \* \* \*

A. No.

Q. He could have bought it from Vermont or Florida or anywhere—

\* \* \* \* \* \*

A. He could not have brought it from Florida.

Q. Because that's not a deposit state?

A. Right.

Q. But he could have bought it from Vermont?

A. Yes, he could have.

■ Given the foregoing, it appears on this record that the price increases, imposed only upon Best Brands, constitute at this point an unrebutted *prima facie* showing of discriminatory pricing in violation of the Robinson-Patman Act, 15 U.S.C. § 13(a), and a sufficient showing has been made that the secret appointment of Consolidated is a breach of Best Brands' right of exclusivity.

■ *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983), provides needed guidance here. Normally, discriminatory pricing is caused by a selective *reduction* to one customer only and can be justified by showing it was made in good faith to meet an equally low price of a competitor. In this quite unusual situation however, where the discrimination is created by *increases* to one customer only, two things must be kept in mind. First, a seller may raise prices to one or more customers to increase profits; however, second, the seller must then be prepared to show that as to those who continue to get the former lower prices, the lower prices result from a good-faith effort to meet competitors' lower prices. *Falls City Industries, Inc. v. Vanco Beverage Inc.*, 460 U.S. at 445, 103 S.Ct. at 1294. No such good faith justification has been offered here and the burden is on Falstaff to make the showing. Indeed, as shown earlier, Falstaff's own management not only did not know why the unilateral increases were being imposed but also questioned their wisdom, and no effort whatever was made before me to show why prices were left lower to all other master distributors. Falstaff's ex-

planation offered for the creation of a dual distributorship is equally unacceptable. See *supra.*

 Best Brands has invested time, money and effort in developing a demand for Falstaff's products. Because 90% of Best Brands sales are of Falstaff products, its survival is endangered by both the price increases *and* the loss of exclusivity on which the distributorship was predicated. Because the loss of income could never be measured and the loss of customers from such an event might never be recouped, and because the net result may well be bankruptcy, a preliminary injunction is necessary here to preserve ongoing business. *Roso-lino Beverage Distributors, Inc. v. Coca-Cola Bottling Company of New York, Inc* 749 F.2d 124 (2d Cir.1984); *Carlos v. Philips Business Systems, Inc.,* 556 F.Supp. 769, aff'd, 742 F.2d 1432 (2d Cir. 1983).

The preliminary injunction standard in this Circuit requires:

> 1) a showing of irreparable injury and b) either 1) likelihood of success on the merits or 2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief.

*Jack Kahn Music v. Baldwin Piano & Organ,* 604 F.2d 755 (2d Cir.1979). On this record, these criteria are more than met. Irreparable injury has been shown as has likelihood of success on the Robinson-Patman claim as to which a *prima facie* violation is established on this record. Moreover, I note that by leaving the injunction in place, I do no more than maintain the status quo of a business relationship that has heretofore been quite lucrative to both parties. Falstaff has not been heard to complain of Best Brands' energy or enthusiasm in creating and strengthening the market for its products. On the contrary, until it recently asserted its "minority market" argument, see *supra,* Falstaff had expressed nothing but praise and encouragement for Best Brands' success, and demonstrated its confidence by continually enlarging Best Brands' territory of exclusive operation. All else being equal, Falstaff presumably will continue to be well served by Best Brands whose interest in maximizing sales is identical to its own.

I also conclude that the remaining preliminary injunction tests are met as well. Best Brands' showing as to discriminatory pricing and the breach of its exclusive contract raise sufficiently serious questions going to the merits to make them a fair ground for litigation, and the balance of hardships tips decidedly toward Best Brands which faces possible business destruction.

On the basis of the foregoing, a preliminary injunction is ordered nullifying the unilateral price increases imposed since October 1984, and restraining any interference whatsoever with plaintiff's exclusive master distributorship. The motion for a rehearing of the contempt order is denied.

Submit formal order on notice.