**DAIRY KING, INC.**

v.

**KRAFT, INC.**

**Civ. No. Y-85-3860.**

United States District Court, D. Maryland.

Sept. 29, 1986.

Judith O'Neill, and William K. Meyer, Baltimore, Md., for plaintiff.

John A. MacColl, David Clarke, Jr., and Lewis A. Noonberg, Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Plaintiff and defendant have each moved for partial summary judgment on Counts IV and V of plaintiff's amended complaint, which allege separate violations of the Rob-

inson-Patman Act, 15 U.S.C. § 13(a). Plaintiff seeks summary judgment on the issues of liability and damages, with the amount of damages to be determined at trial and trebled pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15.

FACTS

Plaintiff Dairy King, Inc., is a wholesaler of dairy, delicatessen, and specialty food products. It distributes these products to retailers in Maryland, southern Pennsylvania, and parts of Delaware and Virginia. It purchases and distributes some products manufactured by defendant Kraft.

At issue in these motions is Kraft's "Breakstone" line of premium cultured dairy products. Kraft's predecessor, Breakstone Brothers, Inc., manufactured and distributed dairy products for many years. It maintained a Maryland operation, with headquarters in Baltimore, until 1953. When Breakstone discontinued its Maryland operation, Murray Goldstein left its employment and formed Dairy King. Dairy King began to distribute Breakstone products in Maryland and remained virtually the only distributor of those products until 1982. In the interim, Kraft, Inc. purchased Breakstone Brothers and "Breakstone" eventually became a brand name for Kraft's premium line of products.

Counts I, II, and III of Dairy King's complaint seek declaratory relief, specific performance and damages in a dispute with Kraft concerning an agreement purportedly made in 1953 between Breakstone and Dairy King or Goldstein. Counts VI and V allege price discrimination by Kraft in 1982 and 1985 in violation of the Robinson-Patman Act.

COUNT IV

In 1982, Kraft offered to sell Breakstone products to Richfood, a Richmond-based food distributor with operations in Virginia, Maryland and other states, under a "New Authorization Allowance." This promotion allowed Richfood to buy Breakstone products at a 50 percent discount for a two-week period, and was offered to food distributors who had not previously purchased Breakstone products. During the pro-motion, Richfood was able to offer Breakstone products to retailers in the Baltimore area at lower prices than Dairy King, and at least seven Dairy King accounts switched to Richfood during the promotion. In addition to these lost sales, Dairy King had alleged that it lost credibility in the marketplace because of its inability to meet Richfood's prices.

■ Section 2(a) of the Robinson-Patman Act makes it unlawful to discriminate in price (1) between different purchasers, (2) of commodities of like grade and quality, (3) where the effect of such discrimination is to substantially lessen competition or tend to create a monopoly if a product is involved in interstate commerce. *See Federal Trade Commission v. Sun Oil Co.,* 371 U.S. 505, 513, 83 S.Ct. 358, 363, 9 L.Ed.2d 466 (1962); *Universal Lite Distributors, Inc. v. Northwest Industries, Inc.,* 452 F.Supp. 1206, 1214–15 (D.Md. 1978), *aff'd in pertinent part,* 602 F.2d 1173 (4th Cir.1979). To establish a *prima facie* case, the plaintiff need only establish a "reasonable possibility of harm" to competition. *Falls City Industries v. Vanco Beverage,* 460 U.S. 428, 432, 435, 103 S.Ct. 1282, 1287, 1288, 75 L.Ed.2d 174 (1982). Thus, these motions for partial summary judgment turn on the price discrimination and "reasonable possibility of harm," or competitive injury, elements of Dairy King's claims.

It is undisputed that Kraft sold Breakstone products to Richfood at lower prices than it offered Dairy King for two weeks in late September and early October, 1982. Kraft asserts, however, that the lower prices were in the form of introductory discounts offered to distributors who had not previously purchased Breakstone products. Such introductory discounts have been found not to violate the Robinson-Patman Act in two cases.

In *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919 (9th Cir.1980), the Ninth Circuit held that one-time introductory discounts on spaghetti sauce, given to merchants who had not previously stocked

the product, did not violate the Robinson-Patman Act. The court found that "detailed statements, based on ... personal knowledge and supported by documentary evidence, explaining that the introductory discounts were equally available to any qualified purchaser" were sufficient to establish that the alleged price discrimination was permissible. It upheld the district court's grant of summary judgment on *Hunt-Wesson's* Robinson-Patman claim. *Id.* at 929. Similarly, in *Interstate Cigar Co., Inc. v. Sterling Drug, Inc.*, 1980–2 Trade Cases (CCH) ¶ 63, 430 (S.D.N.Y. 1980), *aff'd*, 655 F.2d 29 (2d Cir.1981), the district court held that a 25 percent discount available to distributors who had not purchased Haley's M–O from the defendant in the previous year was not illegal price discrimination. The court found that the discount was available to all new purchasers for identical terms, and suggested that even "old" purchasers of the product could qualify by refraining from purchasing it for a year.

The *Interstate Cigar* analysis was based on the Second Circuit's decision in *FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019 (2d Cir.1976). There, the court upheld a system of different prices for auto parts to wholesalers and retailers who performed different functions in Ford's line of distribution. The Second Circuit concluded that the Robinson-Patman Act "require equality of treatment among purchasers, but it does not require a seller to adopt a single uniform price under all circumstances.... This principle has been applied in cases which found no violation of § 2(a) in pricing plans which, though varying prices according to different terms of sale, were administered equally to all purchasers." *Id.* at 1026 (citation omitted).

Here, two of Kraft's employees have testified that the 1982 New Authorization Allowance was an introductory discount available to any new distributor of Breakstone products or any distributor who persuaded a retailer to carry Breakstone products it had not previously carried. This testimony is corroborated by Kraft's announcement of the 1982 New Authorization Allowance,

which specifies that "[t]o qualify as a new authorization, a product cannot have been purchased by the customer, for the stores involved, anytime during the preceding twelve months."

Dairy King correctly notes that Kraft's employees disagree about the terms of the New Authorization Allowance—whether wholesalers like Richfood could qualify simply by agreeing to carry Breakstone products or whether it was necessary that the wholesalers also secure new retail outlets for Breakstone products. This disagreement is irrelevant, however, because in either case Kraft's New Authorization Allowance would be permissible under the theory articulated in *Interstate Cigar* and *Hunt-Wesson.* As the *Interstate Cigar* court said,

[t]his discount effectively entices and encourages new customers for these products, all of whom proceed to compete against one another.... As a result, the total number of distributors of Haley's M–O is increased, thereby increasing the competition among the distributors.... On the other hand, there is no commercial justification for defendants to offer this discount to "old purchasers" of Haley's M–O. The inducement factor is absent as there is no need to encourage regular customers to buy Haley's.

■ Plaintiffs have failed to allege that the 1982 promotion was not equally available to all new Breakstone distributors or that it was merely a device to circumvent the Robinson-Patman Act. Rather, plaintiffs have simply contended that no "new business" exception to the Act exists and ignored the cases holding that introductory discounts are permissible. Therefore, following *Interstate Cigar* and *Hunt-Wesson,* the Court will deny Dairy King's motion and grant Kraft summary judgment on Count IV.

The remaining Robinson-Patman element is that of competitive injury. Dairy King attempts to demonstrate the requisite injury to competition in three ways. First, it contends that the "inference of injury" test

set out in the Supreme Court's opinion in *FTC v. Morton Salt*, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), is applicable. There, the Court held that competitive injury under § 2 "is established prima facie by proof of a substantial price discrimination between competing purchasers over time." *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435, 103 S.Ct. 1282, 1288, 75 L.Ed.2d 174 (1983). *Prima facie* cases have been established where price discrimination is sufficient to influence resale prices, *Morton Salt*, 334 U.S. at 47, 68 S.Ct. at 828, where a substantial price difference exists in a highly competitive or low-profit industry, *see United Biscuit Co. v. FTC*, 350 F.2d 615, 621–22 (7th Cir.1965), *cert. denied*, 383 U.S. 926, 86 S.Ct. 930, 15 L.Ed.2d 845 (1966); and where there has been a "substantial, sustained differential between competing resellers," *see National Dairy Products Co. v. FTC*, 395 F.2d 517, 521 (7th Cir.1968). Here, Dairy King has submitted evidence that resale prices of Breakstone products were influenced by Kraft's New Authorization Allowance and that the grocery industry is one where competition is keen and profits low.

Dairy King has failed to recognize that the *Morton Salt* inference, as restated in *Falls City, supra,* is established by proof of substantial price discrimination over time. In the *Morton Salt* case, standard discounts were offered to bulk purchasers of salt year-round. In *Falls City Industries,* the price discrimination in beer sales had continued for six years. Even assuming that the discounts offered Richfood were substantial, the two-week duration of the New Authorization Allowance cannot be said to have been "over time" or "sustained." Thus, Dairy King cannot establish its *prima facie* case under the *Morton Salt* rule.

However, Dairy King also attempts to establish competitive injury with evidence that sales were diverted from Dairy King to Richfood in at least seven cases during the two-week New Authorization Allowance. Under the *Falls City* theory, direct evidence of diverted sales was used to es-

tablish the competitive injury required for a *prima facie* case under § 2(a). *Falls City*, 460 U.S. at 437–38, 103 S.Ct. at 1290. Thus, Dairy King's evidence of competitive injury consists of the sales diverted from seven stores during the two-week promotion, which Kraft asserts totaled $3,200.

## COUNT V

In 1985, Kraft announced a New Authorization Program providing discounts on certain frozen and cultured dairy products, including the Breakstone line. The program was offered during the first quarter of 1985 in Kraft's Northeast, Southeast and Midwest sales regions to distributors who had not purchased particular sizes or types of Kraft products in the previous six months. B. Green Company, a Baltimore-based distributor of grocery and dairy items and a competitor of Dairy King, participated in the New Authorization Program and began to carry the Breakstone line in 1985.

At about the same time it offered the New Authorization Program, Kraft offered a "Marketwide Promotion" to all its customers in the Baltimore/Washington sales area. The Marketwide Promotion was apparently a response to Dairy King's complaints about previous promotions. The discounts offered under the two programs were apparently identical. However, Dairy King argues that because B. Green was notified of the New Authorization Program in January, and Dairy King was not notified of the Marketwide Promotion until February 4—when B. Green was already taking orders for discounted Breakstone products—the discounts were not available on equal terms. This constitutes price discrimination in violation of the Robinson-Patman Act, Dairy King asserts. Of course, under the *Interstate Cigar* and *Hunt-Wesson* analysis, adopted by this Court, the New Authorization Program is a permissible introductory discount regardless of any other promotional programs Kraft may have offered.

Setting aside the issue of introductory discounts, Dairy King's remaining evidence

of competitive injury in 1985 is similar to that offered for the 1982 discounts. A Dairy King employee has testified that during the New Authorization Program, 19 retail stores that had previously purchased Breakstone products from Dairy King began purchasing from B. Green. Kraft asserts that these sales accounted for an unknown portion of the $2,800 in Breakstone products B. Green purchased during the promotion.

As to both counts, Kraft argues that any injury Dairy King might have suffered during the two promotions was both temporary and *de minimus* and could not have substantially lessened competition. Courts in other cases have ruled similar incidents *de minimus* and dismissed plaintiff's Robinson-Patman claims. For example, in *Olympia Co. v. Celotex Corp.*, 597 F.Supp. 285 (E.D.La.1984), *aff'd*, 771 F.2d 888 (5th Cir.1985), the district court's holding that six incidents of price discrimination resulting in an aggregate price differential of approximately $1,000 was not actionable under the Robinson-Patman Act. Similarly, the trial court in *Hunt-Wesson* held that introductory discounts given to merchants stocking spaghetti sauce were *de minimus* and granted summary judgment for the defendant. 627 F.2d at 929.

*American Oil Co. v. Federal Trade Commission* involved a period of alleged price discrimination, 17 days, roughly equal to those alleged by Dairy King. The Seventh Circuit's decision set aside an FTC cease and desist order, partly because the court found no causal connection between price discounts and injuries suffered by the plaintiff and partly because the injuries suffered were merely a "relatively minor and temporary loss of business." *American Oil*, 325 F.2d 101, 105 (1963). The court observed that

> [t]he record discloses no basis for a conclusion that there was a likelihood of any substantial impairment of the 'vigor or health of the contest for business' between ... competing dealers. And that is the competition which is sought to be protected by the statute in the context of the situation here (discount to certain dealers during gas price war).

*Id.* at 104–05.

The parties have debated at length the purpose of the Robinson-Patman Act as reflected in its legislative history and subsequent interpretation by the courts. Dairy King emphasizes legislative history indicating that the Act was passed, amending the Clayton Act, so that violations could be proved through evidence of injury to individual competitors. It also relies on *Morton Salt* and *Falls City Beverage*, where violations were shown by inference. Kraft, on the other hand, stresses recent cases holding that the principal purpose of the act is to protect the competitive process rather than individual competitors. *See, e.g., Foremost Pro-Color, Inc. v. Eastman Kodak*, 703 F.2d 534 (9th Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712. "The naked demonstration of injury to a specific competitor without more is not sufficient to show that price discrimination 'may' substantially lessen competition; the test must always focus on injury to *competition*." *Id.* at 548 (emphasis in original).

The Fifth Circuit, in reversing an award of damages in a Robinson-Patman case, held that "[t]he reasonable possibility of substantially lessening competition has been interpreted in this Court as requiring the plaintiff to prove that the result of the price discrimination 'is likely to be a severe, adverse effect on competition.' (Citations omitted) ... In order to show a violation of § 2(a) of the Robinson-Patman Act, a plaintiff must demonstrate that the likely effect of the alleged price discrimination was to allow a favored competitor to draw significant profits or sales away from him, the disfavored competitor." *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 580 (1982). The court also suggested that "[c]ourts must be careful in each case to distinguish between price difference which cause anticompetitive effects and those which reflect 'a desirable response to competition and considerations of efficiency,' " *quoting* Cooper, Price Discrim-

ination Law and Economic Efficiency, 75 Mich.L.Rev. 962, 969 (1977).*

In this case, Dairy King's evidence of competitive injury consists only of its own lost sales during the two-week promotions. Although these are "diverted sales" like those found to establish a *prima facie* § 2 violation in *Falls City Beverage,* they do not demonstrate the "reasonable possibility of harm" to competition which that case set as the standard for § 2 violations. In fact, as Kraft contends, it appears that competition in the resale of Breakstone products has increased substantially as a result of the 1982 and 1985 discounts because Richfood and B. Green now compete with Dairy King in the resale of Breakstone products.

Accordingly, because Kraft's 1982 sales to Richfood and 1985 sales to B. Green are permissible introductory discounts, and because Dairy King has failed to submit evidence that could establish a reasonable possibility of harm to competition as a result of those discounts, Dairy King's motion for partial summary judgment on the issues of liability and damages in Counts IV and V will be denied, and Kraft's motion for partial summary judgment on Counts IV and V will be granted.

---

* In *J. Truett Payne,* the plaintiff's evidence of competitive injury was held to be insufficient to create a jury question. The case concerned a Chrysler incentive program giving bonuses to dealers who exceeded sales objectives set by Chrysler. The goals were set on the basis of the dealer's own sales during a prior period of similar market conditions. The plaintiff alleged that the bonuses constituted illegal price discrimination because they had the effect of giving the dealers who received them lower prices. Competitive injury was shown by testimony by the owner of the plaintiff dealership that customers and salesmen had told him his dealership was being undersold. Plaintiff's expert witness testified, however, that the effect on the bonuses was to keep the market price artificially high, rather than low. The Fifth Circuit, on remand from the Supreme Court, held that this testimony was "speculative and unsupported" and was legally insufficient to support a finding of price discrimination. *Id.* at 581.