DAIRY KING, INC., Plaintiff,

v.

KRAFT, INC., Defendant.

Civ. No. Y–85–3860.

United States District Court,
D. Maryland.

July 16, 1987.

On Motion to Reconsider Aug. 18, 1987.

William K. Meyer and Judith D. O'Neill, Baltimore, Md., for plaintiff.

John A. MacColl and David Clarke, Jr., Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Occasionally, courts are asked to decide cases that cannot be decided—or, more precisely, that cannot be decided completely and conclusively. This is one of those cases. Complaints and motions have been filed, allegations made, facts discovered, a trial held and a verdict rendered, but important questions remain unanswered. In this memorandum the Court will address those questions and decide the case as conclusively as possible, given its unusual facts and circumstances.

## BACKGROUND

The background of this case was summarized in *Dairy King, Inc. v. Kraft, Inc.,* 645 F.Supp. 126 (D.Md.1986).[1] A three-day jury trial was held in December 1986. In an amended complaint filed without objection on the eve of trial, Dairy King alleged that it had executed a contract with Breakstone Brothers in 1953 that gave it exclusive distribution rights for Breakstone products in Maryland. It claimed that the contract contained a provision requiring Kraft to buy out Dairy King, thus terminating the exclusive distribution agreement, before reentering the Maryland market. Dairy King alleged that its copy of the contract had been lost or stolen in the mid–1950s but contended that the contract remained in effect.

Murray Goldstein, Dairy King's president and sole shareholder, and others testified about the events which led him to form the business and about the contract Goldstein made with Larry Becker, Breakstone's executive vice-president. Following a special verdict form, the jury found that Dairy King and Breakstone Brothers, Kraft's predecessor, had executed a contract giving Dairy King an exclusive right to distribute Breakstone products in Maryland. The jury also found that the contract required Breakstone to buy back Dairy King before it reentered the Maryland market and sold Breakstone products to other distributors. The jury awarded Dairy King $20,000 for sales lost as a result of Kraft's decision to re-enter the Maryland market in 1985.

Kraft has moved for judgment notwithstanding the verdict and for a new trial, and these motions will be addressed in Part I of this Memorandum. This Court also held a hearing on the scope of the contract's "buy-back" provision, which will be discussed in Part II. Dairy King's motions

---

1. Plaintiff Dairy King, Inc. is a wholesaler of dairy, delicatessen, and specialty food products. It distributes these products to retailers in Maryland, southern Pennsylvania, and parts of Delaware and Virginia. It purchases and distributes some products manufactured by defendant Kraft.

   At issue ... is Kraft's "Breakstone" line of premium cultured dairy products. Kraft's predecessor, Breakstone Brothers Inc., manufactured and distributed dairy products for many years. It maintained a Maryland opera-

tion, with headquarters in Baltimore, until 1953. When Breakstone discontinued its Maryland operation, Murray Goldstein left its employment and formed Dairy King. Dairy King began distributing Breakstone products in Maryland and remained virtually the only distributor of these products until 1982. In the interim, Kraft, Inc. purchased Breakstone Brothers and "Breakstone" eventually became a brand name for Kraft's premium line of products.

645 F.Supp. at 127.

for declaratory and injunctive relief will be addressed in Part III.

## I. *The Contract and the Buy-Back Provision*

On the eve of trial, Dairy King moved to amend its complaint to recast its legal theories and change the relief sought. In its previous complaint, Dairy King sought specific performance of the buy-back provision as a remedy for Kraft's breach of the exclusive distribution agreement. In the amended complaint, it recharacterized the buy-back provision as a method of termination rather than a remedy and sought specific performance of the exclusive distribution provision. Memorandum of Points and Authorities in Support of Motion for Leave to Amend at 5. Kraft did not object, and leave to amend the complaint was granted. The case went to trial on the theory alleged in the amended complaint.

### A. *Motion for JNOV*

In its Rule 50 motion for judgment notwithstanding the verdict, Kraft contends that Dairy King's evidence on the terms of the contract and the buy-back provision is simply insufficient.

█ Three witnesses testified for Dairy King about the contents of the contract: Murray Goldstein, his wife Edith Goldstein, and Walter Kushner, an accountant who was present at Dairy King's organizational meeting. Another witness, Eugene Pitnick, testified that he had been present when Murray Goldstein and Becker discussed plans for Goldstein to take over Breakstone's Baltimore branch and that Becker dictated a contract to a stenographer. Their testimony, although sketchy, provided sufficient evidence for the jury to find that a contract existed, that it gave Dairy King exclusive distribution rights, and that it included a "buy-back" provision.

█ Although the testimony was inconsistent, there was also sufficient evidence

to support the jury's finding that the "buy-back" option was to be exercised before, rather than after, Breakstone reentered the Maryland market. Murray Goldstein stated on direct examination that Breakstone's obligation was to pay "the fair value of Dairy King at the time Breakstone wanted to come back into the market." On redirect, he stated that "if they [Breakstone] came into Maryland and that broke the contract, they would buy us out...." and "there was no question that if ever they came in and broke the contract, they would buy Dairy King out at its fair value." Obviously, Goldstein's testimony supported both Dairy King's theory that the buy-back had to occur before Kraft reentered the market and Kraft's theory that the buy-back was a remedy to be used after Kraft "came in and broke the contract."

The testimony of Dairy King's other witnesses is similarly inconsistent. Edith Goldstein said "that was their way of coming in, by buying out Dairy King at a fair market value ...," indicating that the buy-back was a prerequisite to market reentry, but Kushner testified that "in case either one of the parties ... decided to break the contract, there was a formula as to what damages would have to be paid ...," indicating that the buy-back was a remedy that would occur after reentry. Nevertheless, in reaching its verdict the jury apparently credited part of the testimony and discounted other testimony as misspoken or based on faulty recollection. Thus, Kraft's motion for judgment notwithstanding the verdict must be denied.

### B. *Motion for New Trial*

█ Kraft has also moved under Rule 59 for a new trial, arguing that it was prejudiced by the Court's failure to give an instruction on damages for breach of the buy-back provision. The instruction was based on Kraft's theory that damages are an appropriate remedy for breach of the buy-back provision.[2]

---

**2.** Kraft contends that such damages should be measured by the difference between the buy-back contract price and the fair market value of the buyback business. Since it is undisputed

that the contract established as the buyback price the fair market value of Dairy King, these damages would be zero.

Kraft's proposed instruction read:

Kraft's motion will be denied. Even if the Court's refusal to give Kraft's requested instruction was error, it was harmless and under Rule 61 cannot serve as the basis for a new trial. The jury found expressly that the buy-back was a method of termination rather than a remedy. Therefore, the jury would never have reached the issue of damages for refusal to honor the buy-back remedy. Kraft was not prejudiced, and no new trial is necessary.

## II. *Other Contract Terms*

At trial, it became apparent that there was little evidence relating to the time at which the contract would terminate or whether changes in Dairy King's business were anticipated in the contract. Murray Goldstein testified that "the only way it could have a time limit is when Breakstone wanted to come back in and they had the right to come back in at any time...." Eugene Pitnick, who was present when the contract was dictated, testified that he heard no discussion about the time frame of the contract and but said he believed the parties were looking no more than a year or two ahead. In the absence of any other evidence on this point, Dairy King argues that the contract remains in effect.

Entangled with the question of the contract's time frame is the question raised by the enormous changes in Dairy King's business since 1953. It is undisputed that in 1953, almost all of Dairy King's sales were Breakstone products; today Dairy King carries countless other product lines and Breakstone products account for approximately ten percent of its sales.

Some testimony at trial suggested that the parties had anticipated at the time the contract was negotiated and executed that Dairy King would sell some non-Breakstone products. Goldstein testified that he and Becker knew that the newly-formed Dairy King would have to distribute prod-

ucts other than Breakstone in order to be profitable. On direct examination, he said:

No distributor that sold only Breakstone was succeeding, that there had to be items ... that would help support the Breakstone products. Becker knew it, I knew it as an official of Breakstone, and we realized that if we were going into the distributor business we had to handle those items.

Tr. Vol. II at 53–55. This testimony indicates that Goldstein and Becker expected that Dairy King would carry other product lines. However, it does not establish that this expectation was provided for in the contract, or that Breakstone agreed to buy back Dairy King's inventory and business in product lines other than Breakstone. Indeed, Goldstein's testimony on cross-examination suggests otherwise. When asked:

Q: Now through the years did you, let's say since Mr. Becker died [in] 1968, did you ever call up Kraft and say, gee, fellows, we are going to add all these lines and do all this and it may add to the value of my company that you may have an agreement to buy out some day, did you ever do that, sir?

A: No, you didn't have to do that. They understood the distributing business and they knew the distributors had to add lines. It was something, you didn't have to discuss.

Tr. Vol. III at 106–09. Goldstein's response indicates that the possibility that Dairy King might add non-Breakstone product lines was "understood," but not explicitly discussed. Presumably, if the contract had specifically addressed the addition of non-Breakstone lines, Goldstein would have so testified.

At the post-trial hearing, Goldstein testified that a limited buy-back was never discussed and said the buy-back provision was meant to include everything. However, the weight of Goldstein's hearing testimony must be gauged carefully, because it

In the context of this case, if you find that Kraft has breached an agreement to purchase Dairy King's business, Dairy King's damages are measured by the full contract price minus the market value of Dairy King's business at the date of breach.

In this case, you may find the contract price was equal to the market value of Dairy King's business at the date of breach. If you so find, you can award no damages.

was given after the Court had questioned whether Breakstone would have agreed to an unlimited buy-back. For the foregoing reasons, the Court finds that the contract did not specify whether the buy-back related only to Dairy King's Breakstone business or whether it was to include all Dairy King's Breakstone and non-Breakstone business.

### III. *Declaratory and Injunctive Relief*

Dairy King seeks a declaratory judgment under Rule 57 in addition to a permanent injunction relief. The unusual facts of this case require a blend of declaratory and injunctive relief that will apprise the parties of their rights and liabilities and compel them to act accordingly. The basic contract, as found by the jury, has been discussed in Parts I and II. This section will consider whether specific performance of the contract is appropriate, what performance should be ordered in light of the discussion in Part II, and what declaratory relief is appropriate.

### A. *Specific Performance*

Dairy King seeks specific performance of the contract in the form of an injunction preventing Kraft from selling Breakstone products to other distributors or retailers in Maryland. Of course, specific performance is appropriate only if money damages would be an inadequate remedy. Dairy King contends that damages would be inadequate because it is uniquely dependent on the Breakstone line, and the loss of its exclusive distributorship could not be calculated or fully compensated. It claims to be identified by retailers as the exclusive Breakstone distributor; consequently, it claims, it gains entry to more retail stores and has a larger share of the Baltimore area market than it would have otherwise.

Courts have granted injunctive relief in cases where money damages could not fully compensate for the loss of a business, *see Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.,* 749 F.2d 124 (2d Cir.1984), and where the potential loss of business cannot be calculated, *Philip Morris Inc. v. Pittsburgh Penguins,* 589 F.Supp. 912 (W.D.Pa.1983). For similar reasons, an injunction is appropriate to enforce the exclusive distribution agreement here. It would be extremely difficult to calculate the damages that would result if Dairy King lost its exclusive distribution right.

More importantly, without an injunction, Dairy King's only remedy for Kraft sales to other distributors would be an endless succession of suits for lost sales. The jury found that the contract called for Kraft to buy out Dairy King before reentering the Baltimore market. Kraft is correct in pointing out that this version of the contract apparently sprang from the forehead of Dairy King's counsel on the eve of trial, but Dairy King nevertheless persuaded the jury that it was the contract signed by the parties in 1953.

Under the jury's verdict, because Kraft has not yet offered to buy out Dairy King, the contract has not been terminated and therefore remains in effect. Without an injunction to prevent further contract breaches, Dairy King's only remedy for such breaches would be periodic suits seeking damages for lost sales. These suits would continue as long as Kraft continued to sell Breakstone products to retail stores and other distributors.

Finally, an injunction ordering Kraft to honor Dairy King's exclusive distribution right will establish what the terms of the contract are so that the parties can act accordingly. If this Court enforces Dairy King's exclusive right, it must also enforce Kraft's option to buy out Dairy King and terminate the contract. Thus, Kraft can either resume its exclusive arrangement with Dairy King or offer to buy Dairy King out at its fair market value. Dairy King could then accept Kraft's offer, litigate its adequacy, or refuse it and continue to do business without the exclusive distribution agreement. The Court recognizes that this may only serve to delay the difficult valuation of Dairy King's business, but specific performance of the exclusive distribution agreement and the buy-back provision seems to be the best approach to that problem. What will ultimately be valued if the

buy-back option is exercised will be Dairy King's business on the date Kraft reentered the market, not the intangible injury its business will suffer if the exclusive distribution right is lost.

### B. *Specific Performance of the Buy-Back*

Before granting injunctive relief, this Court must be able to ascertain with reasonable certainty the terms of the contract and the duties of both parties. If the terms of a contract are too uncertain, a court may deem it unenforceable, and this Court has contemplated that possibility in this case. However,

> as the courts put it: 'The law does not favor, but leans against, the destruction of contracts because of uncertainty; and it will, if feasible, so construe agreements as to carry into effect the reasonable intentions of the parties if that can be ascertained.' If there is sufficient intent expressed to make a legally valid contract, a court of equity can make certain by its decree, within reasonable limits, subordinate details of performance which the contract itself does not state.

Williston on Contracts, § 1424 (3rd ed. 1968).; *see also Nusbaum v. Saffell,* 271 Md. 31, 36–37, 313 A.2d 837 (1974)[3]. Similarly, Corbin indicates that "Courts should be ready to give those reasonable interpretations that ordinary business men are willing to give ..." Corbin on Contracts, § 1174.

Several Maryland courts have suggested that courts may supply missing terms when necessary to permit specific performance of a contract. In *Trotter v. Lewis,* 185 Md. 528, 45 A.2d 329 (1946), the Court of Appeals noted that "[e]xpressions that at first appear incomplete or uncertain are often readily made clear and plain by the aid of common usage and reasonable implications of fact. Apparent difficulties of enforcement due to uncertainty of expression may disappear in the light of courageous common sense." *Id.* at 535, 45

A.2d 329, *quoting* Restatement 2d of Contracts, § 370. *See also Barnes v. Sind,* 223 F.Supp. 572 (D.Md.1963). In *Quillen v. Kelley,* 216 Md. 396, 407, 140 A.2d 517 (1958), the court described the circumstances in which a contract will be enforced and specific performance decreed: "The agreement will be sustained if the meaning of the parties can be ascertained, either from the express terms of the agreement or by fair implication."

Therefore, because specific performance is appropriate, this Court may resolve some uncertainties in the terms of the contract in light of the parties' intent, fair implications of fact, and common sense. In doing so it must keep in mind the other equitable principles that guide a court acting in equity.

In this case, considerable uncertainty surrounds the scope of the buy-back provision in the 1953 contract. There is no testimony that the contract contained a provision specifying whether the buy-back was to include all products distributed by Dairy King or only Breakstone products. This Court must therefore determine the scope of the buy-back provision.

It is undisputed that, in entering the contract, Larry Becker wanted to ensure that Breakstone could reenter the Maryland market and resume direct distribution of Breakstone products to retailers. It is also undisputed that, in entering the contract, Murray Goldstein wanted to be certain that he would be financially compensated if Breakstone reentered the market. *See* III Tr. at 39–40. Goldstein's testimony indicates that the parties' intent was to provide him with a measure of security in the form of an exclusive distributorship and the buy-back provision and to provide Breakstone with a means to reenter the Maryland market. It is difficult to imagine how it would have been in Breakstone's interest to promise to buy back Dairy King regardless of any changes in its business and the addition of new product lines. Conversely, Goldstein's interest in security would seem to be satisfied by a buy-back

---

**3.** Maryland law governs the scope of the remedy because Maryland is the forum state. *Traylor v.*

*Grafton,* 273 Md. 649, 332 A.2d 651 (1975).

provision limited to Breakstone products. In the early years of the business, when success was not yet assured, Dairy King was almost exclusively a distributor of Dairy King products. A promise to buy back other product lines would hardly have mattered to Goldstein and would have afforded only a small increase in financial security.

Murray Goldstein's recollection about the contract and the arrangements for assuming leases and equipment from Breakstone also suggest that the parties saw Dairy King as a replacement for the Breakstone's Baltimore branch, no more and no less, "basically, continuing the branch...." *See* III Tr. at 41. The facts and circumstances surrounding the Becker-Goldstein deal suggest that expansion into non-Breakstone product lines might have been expected but not specifically provided for in the contract.

Finally, common sense suggests that Becker and Breakstone would not have agreed to the contract as Dairy King has hypothesized it. It is absurd to simply assert that Breakstone would buy back Dairy King's non-Breakstone lines in the event of a business failure regardless of the nature or number of those lines. This absurdity is made more apparent by the open-ended nature of the buy-back provision and Dairy King's insistence that it remains in effect 34 years after the execution of the contract. No reasonably prudent businessman would create such an open-ended obligation for his company.[4]

■ Accordingly, this Court finds that the contract did not obligate Breakstone to buy out Dairy King's non-Breakstone business. This interpretation is consistent with testimony about the parties' intentions and the purpose of the contract. Moreover, any other conclusion would be unjust and inequitable because it would allow Dairy King to unilaterally redefine the terms of the contract, forcing Kraft to buy much more than it had bargained for and thus increasing Dairy King's security.

### C. Declaratory Relief

This Court finds, consistent with the foregoing discussion, that a contract was entered by Dairy King and Kraft's predecessor, Breakstone Brothers; that the contract granted Dairy King an exclusive right to distribute Breakstone products in the Baltimore area; that the contract remains in effect; and that the contract will terminate when Kraft buys back Dairy King's business in Breakstone products at its fair market value.

### IV. Conclusion

In the attached Order, this Court will enforce Dairy King's exclusive distribution agreement and enjoin Kraft from selling Breakstone products directly to other buyers in the Baltimore area. The injunction will be in effect until Kraft buys or offers to buy the Breakstone portion of Dairy King's business at its fair market value, at which point the contract and Kraft's exclusive distribution right will terminate.

This Memorandum and Order will not completely resolve this dispute, but it will decide the issues of law and fact that have been properly put before the Court. If further conflicts between the parties arise, the Court will consider appropriate motions for relief.

### ORDER

In accordance with the attached Memorandum, it is this 16th day of July, 1987, by the United States District Court for the District of Maryland, ORDERED:

1. That defendant Kraft, Inc.'s motions for a new trial and for judgment notwith-

---

**4.** Dairy King claims that the jury somehow decided this issue by answering "Yes" to Question 3 on the special verdict form, arguing that the jurors understood the term "Dairy King" to be inclusive of both Breakstone and non-Breakstone business. This argument is disingenuous. The parties did not raise the scope of the buy-back issue at trial, the Court did not intend to raise it in Question 3, and there was absolutely no evidence from which the jury could have decided it. The issue did not truly arise until the evidence was in and the trial was over, when the Court and the parties thought through the ramifications of Dairy King's last-minute amended complaint.

standing the verdict BE, and the same hereby ARE, DENIED; and

2. That plaintiff Dairy King, Inc.'s motion for declaratory relief BE, and the same hereby IS, GRANTED in part and DENIED in part;

3. That plaintiff Dairy King, Inc.'s motion for a permanent injunction BE, and the same hereby IS, GRANTED in part and DENIED in part; and

4. That a copy of this Memorandum and Order be mailed to the parties.

### ON MOTION TO RECONSIDER

■ Dairy King, Inc. has asked the Court to reconsider its order suspending the injunction granted in this case. Dairy King protests the Court's decision not to hold a hearing before entering the order as well as the suspension of the injunction itself, contending that its business will be irreparably harmed. Because the Court finds that the equities of this case weigh in favor of maintaining the status quo, and thus in favor of Kraft's motion for suspension of an injunction, the order will stand.

First, no hearing on the stay was necessary because the Court is well aware of the respective positions of the parties and the hardships an injunction would work on each. Dairy King and Kraft have argued this case at trial, at a hearing, and in post-trial motions. The arguments and proffer Dairy King makes in its motion for reconsideration have been made before and doubtless will be made again. Indeed, Dairy King's arguments and authority were summarized and noted in the Court's July 15 Memorandum, at 1185.

However, having considered the arguments made by Kraft and Dairy King, the Court remains convinced that enforcement of the exclusive distribution agreement while an appeal is pending would be inconsistent with the approach taken in the July 16 Memorandum and Order. Therefore, the stay will continue in effect.

### I. The Injunction

In the July 15 Memorandum at 1185, the Court held that "the unusual facts of this case require a blend of declaratory and injunctive relief that will apprise the parties of their rights and liabilities and compel them to act accordingly." In essence, the Court concluded that this dispute could best be resolved by enforcing the parties' contractual obligations, as found by the jury in its special verdict. The jury found that in 1953 the parties had entered a contract giving Dairy King an exclusive distribution agreement and giving Kraft the option to terminate the contract by buying back Dairy King. It is undisputed that when the parties negotiated the contract the buyback provision was a *quid pro quo* for the exclusive distribution right, giving Kraft the right to terminate the exclusive arrangement at any time. Accordingly, this Court ordered specific performance of the exclusive distribution agreement—the "injunction" Dairy King seeks to enforce pending appeal—while issuing a declaratory judgment setting forth the terms of Kraft's buyback option.

It should be made clear that the injunction requiring Kraft to honor Dairy King's exclusive was not intended to preserve the exclusive arrangement indefinitely. Rather, it was intended only to enforce Dairy King's contractual right while the Court's declaratory judgment ensured that Kraft would have the right to terminate the contract by buying back Dairy King.

Both sides plan to appeal from this Court's decision, and it is apparent that the status quo should be maintained until the Court of Appeals has conclusively decided the issues in dispute. It would be inequitable to enforce Dairy King's exclusive distribution right while the appeal is pending, because as a practical matter Kraft cannot exercise its buyback option until after the appeal is decided. Therefore, on Kraft's motion, the Court suspended the injunction during the pendency of the appeal pursuant to Rule 62(c).

Because of the unusual nature of the remedy crafted in this case, the four-factor *Long v. Robinson* analysis for stay of an injunction cannot be squarely applied. Nevertheless, the discussion of those

factors in Part II demonstrates that a stay is appropriate.

## II. The Stay Pending Appeal

The prerequisites for a stay pending appeal are well-settled under the Court of Appeals' decision in *Long v. Robinson*, 432 F.2d 977 (4th Cir.1970). The party seeking the stay must show (1) that it will likely prevail on the merits of the appeal; (2) that it will suffer irreparable injury if the stay is denied; (3) that other parties will not be substantially harmed by the stay; and (4) that the public interest will be served by granting the stay.

Because the basis for the stay is specifically Kraft's inability to exercise its contractual buyback right during the pendency of an appeal, consideration of the *Long v. Robinson* factors should focus on that aspect of the Court's holding. For example, while Kraft may not prevail completely in its appeal of this case, it is likely that its buyback right will be affirmed.

The irreparable injury Kraft will suffer absent a stay is the inability to exercise its buyback right while Dairy King's reciprocal exclusive distribution right is enforced. Kraft has persuasively argued that enforcement of Dairy King's exclusive arrangement pending appeal "will protect the plaintiff by requiring Kraft to cut off Breakstone sales ..., but Kraft will be *denied* access to the means of termination which was an essential element of the alleged contract. Such a result would be utterly inconsistent with the basis which the Court articulated for its ruling." Kraft Memorandum at 2.

For its part, Dairy King argues that it will suffer irreparable injury—its own destruction—if the injunction is not granted. "In short, the Breakstone line is the only thing that can keep Dairy King in business." Dairy King Memorandum at 4. The Court is not insensitive to Dairy King's difficulties and does not doubt that its sales have declined since Kraft breached the contract and began selling Breakstone products directly. However, Dairy King forgets that it long ago contractually agreed to suffer this injury—the loss of the Break-stone exclusive—whenever Kraft chose to exercise its buyback option. Throughout this litigation, Dairy King has conceded that its exclusive distribution right was subject at any time to Kraft's right to buy Dairy King's business back. It cannot now seek the enforcement of its right to an exclusive while Kraft is constrained by circumstance from exercising its buyback option and, in doing so, terminating the contract.

The Court notes that Dairy King has survived for more than two years since Kraft first breached the exclusive distribution agreement. Even if, as Dairy King claims, it cannot survive until an appeal of this case is heard, it will remain entitled to the compensation established in the contract for the termination of the Breakstone exclusive: the fair market value of Dairy King's Breakstone business at the time of the breach.

Finally, the public interest here is in preserving the status quo by suspending the injunction pending appeal. If the injunction were enforced, a number of Kraft's contractual obligations with third parties would be jeopardized and distribution of Breakstone products would be disrupted. If the injunction is stayed, both Kraft and Dairy King can continue to do business as they have for the last two years.

## III. Conclusion

The "blend of declaratory and injunctive relief" ordered by the Court in this case presupposed that Kraft's buyback option and Dairy King's exclusive distribution right could be given effect simultaneously. Because this is impractical while the parties' appeals are pending, the injunction enforcing Dairy King's right will remain suspended in accordance with the Order entered by the Court on July 16.

## ORDER

In accordance with the attached Memorandum, it is this 18th day of August, 1987, by the United States District Court for the District of Maryland, ORDERED:

1. That plaintiff's motion for reconsideration BE, and the same hereby IS, DENIED; and

2. That a copy of this Memorandum and Order be mailed to the parties.