**BEST BRANDS BEVERAGE, INC.,**
**Plaintiff–Appellee,**

v.

**FALSTAFF BREWING CORPORATION**
**and Pearl Brewing Company,**
**Defendants–Appellants.**

**No. 1339, Docket 87–7279.**

United States Court of Appeals,
Second Circuit.

Argued July 15, 1987.

Decided Nov. 9, 1987.

entirely—not merely that he could not wear it in a patient-care area.

William M. Bitting, Los Angeles, Cal. (Darlene B. Fischer, William A. White, Hill, Farrer & Burrill, Los Angeles, Cal., and Amy D. Kanengiser, Spengler Carlson Gubar Brodsky & Frischling, New York City, of counsel), for defendants-appellants.

Alvin K. Hellerstein, New York City (William K. Jones, Brian M. Cogan, Paul E. Breene, Elizabeth A. Sherwin, Strook & Strook & Lavan, New York City, of counsel), for plaintiff-appellee.

Before NEWMAN, MINER and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendants-appellants Falstaff Brewing Corporation and Pearl Brewing Company ("Falstaff") appeal from a $45,714,000

judgment entered after a jury trial in the United States District Court for the Southern District of New York (Richard Owen, *Judge*), which found in favor of plaintiff-appellee Best Brands Beverage, Inc. ("Best") on its antitrust and state breach of contract claims. The jury's verdict on both claims was based primarily upon evidence that Falstaff raised prices it charged Best for some of Falstaff's products, including various sized packages of Haffenreffer Private Stock malt liquor and Ballentine Ale, and did not charge similar price increases on those products to its other customers. From this evidence, Best argued that Falstaff discriminated against it on the basis of price in violation of the Robinson–Patman Antidiscrimination Act, 15 U.S.C. § 13(a) (the "Robinson–Patman Act" or the "act"), and, accordingly, that it was entitled to recover treble damages pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15(a). Best also claimed that, by raising prices on its products, Falstaff breached an alleged agreement in which Falstaff supposedly had agreed to charge Best the "lowest prices in the East."

After Best presented its case at trial, Falstaff timely moved for a directed verdict pursuant to Fed.R.Civ.P. 50(a) on the antitrust and contract claims, but the district court denied the motion. After the jury returned a $15,238,000 verdict in favor of Best on both claims, Falstaff renewed its Rule 50 motion in the form of a motion for judgment n.o.v. *See* Fed.R.Civ.P. 50(b). The district court denied the post-verdict motion in an endorsed memorandum, and subsequently entered final judgment in favor of Best after trebling the jury verdict to $45,714,000. The district court also awarded Best the sum of $147,352.36 for its attorneys' fees, costs and disbursements incurred in connection with Falstaff's contempt of a preliminary injunction (which is not challenged in this appeal), and entered a permanent injunction against Falstaff prohibiting it from interfering with Best's distributorship or treating Best in a manner different from its other customers through its pricing policy or otherwise. For the reasons stated below, we reverse.

## FACTS

Falstaff jointly produces with Pearl a variety of malt beverages, including Ballentine Ale and Haffenreffer Private Stock malt liquor. Falstaff sells its malt beverage products nationwide from its San Antonio, Texas and Fort Wayne, Indiana breweries. The malt beverage products are sold to customers F.O.B. the docks of either the San Antonio brewery, where Pearl is located, or Fort Wayne, where Falstaff's only active brewery and principal place of business is located.

To aid Falstaff in gaining access to various market regions throughout the United States, it has appointed master distributors in specific regions who serve as master wholesalers within an assigned territory. Currently, Falstaff has appointed two master distributors, Southland Distributing Company ("Southland") and Best, who are assigned to territories in the Southeastern and Mid–Atlantic United States, respectively. Southland's region extends over the six states of North Carolina, South Carolina, Alabama, Georgia, Tennessee and Florida. Best's territory includes New York, New Jersey, Pennsylvania, Delaware, Maryland, Virginia and the District of Columbia.

Falstaff's two master distributors, Southland and Best, operate exclusively within their assigned territories, and apparently have never sold, nor attempted to sell, Falstaff products outside of their assigned territories. Thus, it appears that they have never engaged in face-to-face competition with one another. Likewise, it does not appear that their customers have ever competed with one another—apparently because their customers exclusively conduct business within their respective territories, which encompass several defined geographic markets that ordinarily do not overlap or otherwise intersect.

Although no direct competition exists between Best and Southland, or their customers, there remains a possibility that some products purchased in Southland's territory could make their way into Best's territory, and vice versa. Thus, whenever a substantial price difference exists between two

neighboring markets for the same or similar products, a practice called "transshipping" may occur, whereby an individual or a company purchases a stock of product in the lower priced territory, and "transships" it to the higher priced territory for resale. While this practice may occur, Best has cited no instances of actual transshipping between its and Southland's territories, nor were any known transshippers who operated in Best's or Southland's territories identified.

Best has been a Falstaff master distributor for several years and originally had been appointed to serve as Falstaff's master distributor for the metropolitan New York market when the company was owned by Richard Sane. Falstaff decided to appoint Best as a master distributor in order to discourage it from engaging in its active transshipping business. Best's appointment as a Falstaff master distributor was later confirmed in writing in June 1982 only after its current owners, David and Raymond Tye, insisted that Best's appointment as a Falstaff master distributor be confirmed in a written agreement.

In early 1982, Best's then-prospective (and current) owners, David and Raymond Tye, were interested in purchasing Best in order to expand on its Falstaff master distributorship. The Tyes did not want to purchase the company until they had an agreement from Falstaff regarding the distributorship. David Tye then contacted Falstaff's Chairman, Jack Miller, about Best's position as a master distributor for Falstaff products. Tye subsequently spoke with Clifford Lincoln, Falstaff's General Sales Manager, who informed Tye that he had been instructed to give Best a contract. Lincoln and Tye then met in Chicago on June 1, 1982, where Lincoln delivered to Tye a document entitled "Distributor Report" that indicated that Best was a master distributor for Falstaff in the metropolitan New York City market. The distributor report appeared to suggest that Best's territory was to be exclusive, but it contained no promises, terms or conditions governing the distributorship. In addition, it did not set forth the prices Falstaff would charge Best for Falstaff products, establish the quantity of products to be purchased, or indicate the duration of the appointment.

Once Tye received the distributor report from Lincoln, which he believed to be an agreement, he and his brother purchased Best for approximately $1,000,000, and took control of the company. Tye then began a program designed to increase sales of Falstaff products in the metropolitan New York market. At that time, the only Falstaff product available for resale in the New York market was various sized packages of Ballentine Ale. Best immediately increased sales of that product. The year before Best's appointment, 153,000 cases of Ballentine were sold in New York, but this figure jumped to 1,689,911 by 1983.

Due to Best's success in increasing sales of Falstaff products, Falstaff appointed Best to serve as master distributor for additional markets. Accordingly, between 1982 and 1984, Best's territory grew to its present size. As Best was appointed master distributor over each additional market, no written agreements were signed by the parties, nor were there even any negotiations. Rather, Falstaff merely sent Best letters indicating that Best had been appointed as "master distributor" or "master wholesaler" for the new market.

Best's initial sales efforts were concentrated on distribution of Ballentine Ale, but in early 1983 David Tye introduced Haffenreffer into Best's territory, beginning with the Virginia market and then moving northward. Haffenreffer had sold well in other regions of the United States, but it was virtually unknown in Virginia and other parts of Best's territory. Nevertheless, Tye's introduction of Haffenreffer was successful, apparently because local wholesalers and consumers were familiar with the product due to its marketing in the Southeastern region. Best rapidly became Falstaff's largest purchaser of Haffenreffer, and Haffenreffer sales in Best's territory increased from 31,808 cases sold in 1983 to 1,139,776 cases sold in 1984.

Throughout Best's and Falstaff's relationship, Falstaff charged Best various prices for its products, sometimes increas-

ing the price, and at other times reducing the price for promotional purposes. Best usually was charged the same prices on Falstaff products as Southland, and often was charged lower prices than those charged to Falstaff's other customers. In November 1984, Falstaff announced that, effective December 1, 1984, the price Best was charged for various sized packages of Haffenreffer and Ballentine would be increased significantly (the "December increase"). The December increase was to affect products sold throughout New York State, but Best opted to pass along the increase only to its wholesalers in New York City.

Thereafter, David Tye attempted to contact Falstaff's principal, Paul Kalmanovitz, to seek a rescission of the December increase. Tye had assumed that the December increase was imposed by Falstaff as a punitive measure arising out of an unrelated dispute between Kalmanovitz and his brother, Raymond Tye. Tye had offered personally to resolve the dispute between Kalmanovitz and Raymond if Falstaff would roll back the prices, but Falstaff did not reduce the prices.

Then, on March 28, 1985, Falstaff sent Best another revised price sheet indicating that, effective May 1, 1985, prices charged to Best on Haffenreffer and Ballentine products sold in all states within its territory except New York would be increased by approximately $1.00 or $2.00 per case depending upon the package size and the geographic market (the "May increase"). Again, Tye attempted to contact Kalmanovitz in order to seek rescission of the increase before it went into effect. Tye believed that this increase was also taken as another punitive measure by Kalmanovitz, but Falstaff explained to Best that the increase was imposed in order to place Falstaff products "within the same pricing structure" as products offered by the Anheuser-Busch and Miller Brewing Companies within Best's territory. No increases similar to the December or May increases were charged to Southland. Other Falstaff customers were charged, however, even higher prices than those charged Best.

When Falstaff did not roll back its prices, Best filed the instant action claiming that the price increases violated the Robinson–Patman Act and constituted a breach of an alleged agreement. On May 15, 1985, when Best filed its complaint, it sought a temporary restraining order from the district court requiring Falstaff to roll back its prices to pre-December 1984 levels, which the district court granted on May 16, 1985. This TRO was later converted into a preliminary injunction. *See* 653 F.Supp. 47 (S.D.N.Y.1985).

Subsequent to the commencement of the lawsuit, Best claimed that Falstaff intentionally caused Best's customers to receive inadequate or damaged shipments of its products, appointed another distributing company to serve as a master distributor within Best's territory, attempted to introduce a "competing" malt liquor in Best's territory, and discontinued or interrupted promotional allowances and advertising support for products sold in Best's territory—all of which Best claimed violated its agreement with Falstaff. The validity of these various charges rests, however, upon the existence of an agreement including the terms alleged by Best.

Falstaff has never denied that Best has been, or continues to be, its master distributor, but contends that it never entered into the agreement described by Best.

## DISCUSSION

### A. *Robinson–Patman Act claim.*

The main issue in this appeal is whether Best presented sufficient evidence at trial of a Robinson–Patman Act violation, 15 U.S.C. § 13(a), to sustain the denial of Falstaff's directed verdict and judgment n.o.v. motions. *See* Fed.R.Civ.P. 50(a) and (b). In those motions, Falstaff contended that Best failed to prove at trial the existence of actual competition between Best and Southland as of the time that Falstaff imposed the December and May increases on Best. Falstaff argued, accordingly, that, in the absence of actual competition, any price differential on Falstaff products as between Best and Southland would not be actionable under the Robinson–Patman

Act. Falstaff argues here that the district court erred when it denied its directed verdict and j.n.o.v. motions. We agree.

■■■ Before turning to the sufficiency of the evidence question, we will first review relevant antitrust principles relating to secondary-line price discrimination claims.[1] The Robinson–Patman Act makes it unlawful

for any person engaged in commerce ... to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefits of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a). Thus, the act prohibits a seller from engaging in price discrimination that is likely to result in competitive injury.

■■■ For the purposes of the act, price discrimination means nothing more than a difference in price charged to different purchasers or customers of the discriminating seller for products of like grade and quality. *See F.T.C. v. Anheuser–Busch, Inc.,* 363 U.S. 536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960); *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 28 (2d Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979). The act does not, however, require that sellers offer to their purchasers one uniform price. *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1025–26 (2d Cir.1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977). Rath-

er, it only requires that each purchaser be given an "equal opportunity" by the seller to receive the benefit of higher or lower prices. *Id.* at 1025.

■■■ Nevertheless, price discrimination (or pricing on a non-equal basis) standing alone is not illegal per se. *USM Corp. v. SPS Technologies, Inc.,* 694 F.2d 505, 512 (7th Cir.1982), *cert. denied,* 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983); *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 346 (3d Cir.1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982). Plaintiff also must prove the likelihood of competitive injury resulting from the alleged discrimination.

■■■ In order to establish the requisite competitive injury in a secondary-line case, plaintiff must first prove that, as the disfavored purchaser, it was engaged in actual competition with the favored purchaser(s) as of the time of the price differential. *Lupia v. Stella D'Oro Biscuit Co.,* 586 F.2d 1163, 1170 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979); *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 237, 245 (D.N.J. 1976); *see Anheuser–Busch,* 363 U.S. at 546, 80 S.Ct. at 1273 ("The existence of competition among buyers who are charged different prices by a seller is *obviously important* in terms of adverse effect upon secondary line competition[.]") (emphasis added); 5 J.O. Von Kalinowski, Antitrust Laws and Trade Regulation, § 30.02[1] (1987) (and cases cited therein). *See generally* F. Rowe, Price Discrimination Under the Robinson–Patman Act 173–180 (1962).

■■■ As Rowe has explained, the existence of a "competitive nexus between the

---

1. In price discrimination cases, courts ordinarily analyze the competitive injury component at three basic levels: 1) the seller level, or primary-line effects, 2) the purchaser/customer level, or secondary-line effects, and 3) the customer level, i.e., customers of either the seller or purchaser, or the tertiary level. A primary-line violation occurs where the discriminating seller's price discrimination adversely impacts competition with his—the seller's—competitors. *See, e.g., Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). In contrast, a secondary-line violation occurs where the discriminating seller's price discrimination injures competition among his customers, i.e., purchasers from him. *See, e.g., F.T.C. v. Sun Oil Co.,* 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). Finally, an example of a tertiary violation is set forth in *Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983), where even though the purchasers of the discriminating seller did not compete directly, their customers competed within a unified market region.

customers receiving the higher and the lower prices is a *basic predicate* of any conclusion of adverse effects at the customer level attributable to a seller's price differentials." F. Rowe, Price Discrimination Under the Robinson–Patman Act at 173 (emphasis added). The competitive nexus requirement is satisfied where there is a showing of "competitive contact" between the recipients of the price differential. It must therefore be shown that, as of the time the price differential was imposed, the favored and disfavored purchasers competed at the same functional level, i.e., all wholesalers or all retailers, and within the same geographic market. *Id.* at 173–180.

▆▆▆ Once plaintiff has established the existence of a competitive nexus, he must then prove the likelihood of competitive injury. In a secondary-line case, plaintiff must show that the probable effect of the discrimination would be to allow the "favored competitor to draw sales or profits from him, the unfavored competitor." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 569–70, 101 S.Ct. 1923, 1931, 68 L.Ed.2d 442 (1981) (Powell, J., dissenting in part) (citing *Enterprise Industries, Inc. v. Texas Co.*, 240 F.2d 457, 458 (2d Cir.), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957)); *see Chrysler Credit Corp. v. J. Truett Payne Co., Inc.*, 670 F.2d 575, 580 (5th Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982).

In view of the foregoing, we now turn to the district court orders which denied Falstaff's directed verdict and j.n.o.v. motions and review the sufficiency of the evidence presented at trial. We are mindful, however, that "[a] directed verdict, like a judgment n.o.v., may be granted only when, viewing the evidence most favorably to the party other than the movant, 'there can be but one conclusion as to the verdict that reasonable men could have reached.'" *Diebold v. Moore McCormack Bulk Transport Lines, Inc.*, 805 F.2d 55, 57 (2d Cir. 1986) (citations omitted).

▆▆▆ Trial evidence established that Falstaff charged Best a $1 to $2 price increase in December 1984 for the New York market, and threatened to charge a comparable price increase for products sold in all markets throughout Best's territory in May 1985. It is unclear from the record whether Best ever in fact paid the higher prices for the May increase. Assuming, however, that the higher prices were paid, this lasted for approximately fifteen days, until the district court ordered Falstaff to roll back its prices to November 1984 levels. The price increases were charged to Best, and were not charged to Southland. Thus, trial evidence established the existence of a price difference on products sold to Best and Southland. Moreover, it was not disputed that Falstaff was engaged in interstate commerce, or that the price differences were charged for products of like grade and quality, i.e., Haffenreffer and Ballentine. Thus, the question presented here is whether sufficient evidence of actual competition between Best and Southland (and injury to that competition resulting from the price differences) was presented at trial to establish a prima facie violation of the act.

Best's trial evidence regarding actual competition was sparse. In fact, some evidence presented by Best seemed to contradict inferential evidence that actual competition existed. According to the weight of the evidence, the markets assigned to Best and Southland were exclusive, and neither Southland, nor Best, nor customers of either of them, engaged in competition within the other's territory. Indeed, even as to activity on each side of the Best/Southland border at the Virginia/North Carolina state lines—the area most susceptible to interterritory competition—no evidence was presented suggesting that Best, Southland, or their customers, made purchases in the other's territory, or otherwise competed therein. Thus, unlike the situation in *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983), there was no evidence presented here to establish that a unified market area existed between the two territories or that competition in fact occurred

despite the existence of nominally exclusive territories.

To establish the existence of a competitive nexus between Best and Southland, Best presented evidence indicating that, when a price difference between two neighboring territories exists, "transshipping" occurs. Best offered as evidence of this practice only conclusory statements from various witnesses indicating that transshipping is, and was, a pervasive practice. Moreover, Best presented no evidence establishing that transshipping was likely to or in fact occurred as a result of the December 1984 or May 1985 increases. Indeed, Best did not establish whether transshipping *ever* had occurred between Southland's and Best's territories, did not identify any known transshippers in that region, and did not offer any evidence demonstrating the impact of the alleged transshipping on inter-territory competition.

We do not doubt that transshipping *may* occur as Best suggested at trial. Nevertheless, a careful review of the record compels us to conclude that Best provided insufficient evidence of actual transshipping to give rise to an inference that competition existed between Best and Southland. Given the absence of evidence of actual competition, no reasonable juror could have found that such competition existed between Best and Southland. Since Best failed to establish this essential element of a price discrimination claim, we hold that a prima facie violation of the act was not established, and thus the district court erred when it denied Falstaff's Rule 50 motions.[2]

### B. *Breach of contract claims.*

Falstaff also contends that the jury verdict on the contract claims cannot stand because Best failed to prove the existence of a binding and enforceable agreement. Alternatively, Falstaff contends that even if such an agreement did exist, its enforcement was nevertheless barred by the New York Statute of Frauds. *See* N.Y. Gen. Obl. Law § 5–701. We agree that no valid, enforceable agreement was established at trial.

Before considering the merits of Falstaff's challenge to the verdict on the contract claim, we encounter Best's argument that Falstaff's challenge is procedurally defective. Specifically, Best contends (1) that Falstaff's Rule 50 motion for a directed verdict at the close of the plaintiff's case focused only on the alleged insufficiency of the evidence to show compliance with the statute of frauds, not on the lack of evidence to show formation of a contract, and (2) that Falstaff failed to renew its Rule 50 motion for a directed verdict at the close of all the evidence, thereby rendering ineffective its post-verdict motion for judgment n.o.v. Falstaff initially replies that Best is asserting these procedural arguments for the first time on appeal. Though that may be so, we find the procedural arguments unavailing.

Falstaff's Rule 50 motion made at the close of the plaintiff's evidence emphasized the lack of evidence of an adequate written memorandum, but adequately apprised Best of Falstaff's contention that the plaintiff's evidence failed to show the existence of any contract. Arguing in support of the motion, Falstaff's counsel, after stating that Best's key document was not "a sufficient memorandum," continued, "in fact it doesn't contain promises of any kind or any agreement to do with anything." This statement reflected the point, made unequivocally in Falstaff's trial brief, that "plaintiff cannot produce any cognizable evidence that a valid contract exists." Best fully understood the breadth of Falstaff's contention, as is evident from Best's proposed jury instruction, which stated Falstaff's claim to be that it had "never entered into any agreement with Best Brands."

---

**2.** In light of our holding here, we need not decide whether, even if Best had proven the existence of actual transshipping between Best's and Southland's territory, this evidence would have provided a sufficient basis for finding the likelihood of *substantial* competitive injury, which is necessary to establish a price discrimination violation. *Cf. Interstate Cigar Co. v. Sterling Drug, Inc.,* 655 F.2d 29, 31 (2d Cir.1981) (Robinson–Patman Act claims require proof of *substantial* lessening of competition).

As to the claim of failure to renew the Rule 50 motion at the close of all the evidence, we are satisfied that Falstaff adequately informed both Best and the district court that it continued to believe Best's evidence was insufficient to create a jury issue on the contract claim. At the charge conference, held only a few days before the actual close of the evidence, Falstaff's objections to Best's proposed jury instructions noted that the defendants were reasserting their previously filed memorandum in support of their motion for a directed verdict. When counsel for Falstaff sought to move specifically for a directed verdict on one issue, the trial judge stated that the motion was not necessary since the issue was already "in the case for appellate purposes." The colloquy fairly led counsel for both sides to understand that claims concerning directed verdicts were already sufficiently preserved for appeal. After the charge conference, Falstaff concluded its case with evidence requiring only six pages of transcript, and Best presented brief rebuttal evidence. Moreover, even if Falstaff could be faulted for not formally renewing its Rule 50 motion at the close of all the evidence, such a failure would not preclude consideration of its insufficiency claim in a motion for judgment n.o.v. and on appeal where, as here, the trial judge indicated that further mo-

tion practice was not needed and the party opposing the motion for judgment n.o.v. could not reasonably have thought, during presentation of the movant's defense case, that the movant's "initial view of the insufficiency of the evidence had been overcome and there was no need to produce anything more in order to avoid the risk of judgment n.o.v.," *Ebker v. Tan Jay International, Ltd.*, 739 F.2d 812, 824 (2d Cir.1984).[3] Nothing in Falstaff's defense case could possibly have been viewed by Best Brands as *strengthening* Best's claim of contract formation. There was thus no possibility that Falstaff misled Best into holding back any rebuttal evidence Best might have had on the issue of contract formation, a circumstance that, if occurring, would have made a "trap" of the motion for judgment n.o.v. *Id.* at 824 (quoting 5A J. Moore, *Moore's Federal Practice* § 50.08, at 50–88 (2d ed. 1984)). We therefore reject Best's procedural objections and consider the merits of Falstaff's contention that no contract was established.

In order for an agreement to be enforced, it must be sufficiently "definite and explicit so [that the parties'] intention may be ascertained to a reasonable degree of certainty." *Candid Productions, Inc. v. International Skating Union*, 530 F.Supp. 1330, 1333 (S.D.N.Y.1982) (citations omitted) (applying New York law). Although

---

3. *Ebker* stated two criteria to be met before a failure to renew a Rule 50 motion at the close of all the evidence could be excused. The first concerned the trial judge's indication that renewal of the motion would not be necessary. The second concerned the nature of the evidence following the unrenewed motion for a directed verdict. The test for determining whether that evidence will excuse non-renewal of the motion, said the Court, should not be whether it was "brief and inconsequential," as Professor Moore had urged, *id.* at 824 (quoting 5A J. Moore, *Moore's Federal Practice* § 50.08, at 50.90 (2d ed. 1984)), but

> whether it was of such a character that the opposing party (here Ebker) could reasonably have thought that the moving party's initial view of the insufficiency of the evidence had been overcome and there was no need to produce anything more in order to avoid the risk of judgment n.o.v.

*Ebker*, 739 F.2d at 824 ("moving party" refers to the party subsequently moving for judgment n.o.v.). Unfortunately this passage inadvertent-

ly omits the word "not" between the words "could" and "reasonably." That an omission has occurred is evident from the overall argument in which this passage is included and from the opinion's quotation, immediately following this passage, of a passage from *Moran v. Raymond Corp.*, 484 F.2d 1008, 1012 (7th Cir.1973), *cert. denied*, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974), which supports the argument only if the *Ebker* passage is read with the word "not" inserted. The point is that a party opposing a motion for judgment n.o.v. suffers no prejudice from its adversary's failure to renew a motion for a directed verdict at the close of the evidence where the party could *not* reasonably have thought, based on its adversary's defense case, that the adversary no longer thought there was an insufficiency of evidence. Such a thought could *not* be reasonably entertained where the adversary's evidence, as in *Ebker* and *Moran*, only strengthened its own case and did nothing to strengthen the case of the party opposing the motion for judgment n.o.v.

courts are loath to refuse enforcement of agreements on indefiniteness grounds, *Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 453 (2d Cir.1977), "if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract." *Candid Productions,* 530 F.Supp. at 1330–34 (citations omitted). Moreover, "there [can be] no contract if the parties [have] fail[ed] to agree on all essential terms[,]" *Interocean Shipping Co. v. National Shipping and Trading Corp.,* 462 F.2d 673, 676 (2d Cir.1972) (citations omitted) (footnote omitted), and if the missing terms cannot be supplied through reasonable construction that is consistent with the parties' intent. *Cf. Joseph E. Seagram & Sons,* 552 F.2d at 453 ("Many a gap in terms can be filled, and should be, with a result that is consistent with what the parties [intended]"). *See generally* 1 A. Corbin, Corbin on Contracts, § 95 (1963).

At trial, Best argued that it and Falstaff had entered into an agreement on or about June 1, 1982, pursuant to which Best agreed to discontinue its practice of transshipping and Falstaff agreed to appoint Best as its master distributor for the metropolitan New York area. Best claimed that its distributorship was to encompass an exclusive territory, and that Falstaff would only sell malt beverage products to Best for resale in its territory. According to Best, the alleged agreement included promises that Best would be given "the lowest" prices on Falstaff products for resale "in the East," and that it would be provided with promotional allowances and advertising support equal to that offered by Falstaff to its other master distributors. Furthermore, Best alleged that the agreement was terminable only for good cause and after reasonable notice.

Best's trial evidence regarding the existence of an agreement according to the above-described terms was as follows: David Tye testified that when he and his brother, Raymond, were originally considering purchasing Best, they were attracted to the company because it had been appointed as master distributor of Falstaff products for the metropolitan New York market. According to Tye, in April 1982, he made some initial contacts with Falstaff's then-Chairman, Jack Miller, and during the course of those discussions, told Miller that he wanted a written agreement for an exclusive master distributorship, and that, as part of that agreement, he would be given "the lowest prices" for Falstaff products for resale to wholesalers in his assigned territory. Moreover, he stated that he wanted a condition included in the agreement providing that if Best succeeded in improving Falstaff sales, Best's territory would be expanded.

Tye further testified that he was subsequently contacted by Clifford Lincoln, Falstaff's General Sales Manager, who told him that he had been instructed "to give [Tye] a contract." Tye thereafter flew to Chicago in June 1982 and met with Lincoln for the purpose of signing an agreement. At the Chicago meeting, Lincoln delivered to Tye a printed form document. Best alleged at trial that the document, entitled "Distributor Report", onto which the words "exclusive master" were typed, constituted its agreement with Falstaff.

This distributor report indicated that it related to the metropolitan New York market, and that Best was named as a Falstaff master distributor. Much of the report, however, was left blank. Thus, although financial information regarding the master distributor was called for on the report, no such information was supplied. Other sections of the document were also left blank, apparently because Best was to serve as a "master" and such information was therefore unnecessary. In addition, the report was signed only by Lincoln, but his signature was notarized.

Best claimed at trial, and here, that additional written, signed agreements, relating to each of Best's market territories, were entered into by the parties. Best's proof of these agreements came in the form of several letters from Falstaff to Best, or to Best's wholesalers, that indicated that Best had been "approved" as a "master distribu-

tor" or "master wholesaler" for each of the states in Best's current territory. None of these letters indicated, however, that negotiations had transpired between the parties prior to Falstaff's approval of Best to master the additional territories. Moreover, the letters did not suggest that Best's approval as a master was to include the exclusive right to do so. Nor did they reflect that Falstaff made any contractual commitments to Best in connection with its appointment as master distributor for any of the additional territories.

Best's trial evidence regarding the alleged contractual commitment to give Best "the lowest prices in the East" was based upon Tye's testimony, and statements made by Lincoln in a March 31, 1983 letter sent to Tye. In that letter, Lincoln indicated that it was accompanied by price sheets that reflected price increases charged to Best. Lincoln stated in the letter that Tye should "keep in mind when you discuss your [prices] with anyone, [that] yours are the lowest in the East and have been with the concept of the mastering." No other proof of this promise was offered by Best at trial.

To supply the duration term of the alleged agreement, Best relied upon the testimony of Falstaff's former President, Lutz Issleib, who explained that a distributorship ordinarily "lasts as long as the man orders the product. When he ceases to order product or when he doesn't perform on those sales, it would cease." Best argued that this testimony established that Falstaff agreed not to terminate its distributorship except for good cause.

In addition to the above testimony and evidence, Best called as an expert witness William Sullivan, who was familiar with the beer distribution industry, to testify as to the customs and practices of that industry. Sullivan testified that master distributors ordinarily are assigned exclusive territories, and that the prices they are charged by the brewer are lower than the prices charged to wholesalers or retailers within the master's territory. Sullivan also testified that brewers should, as best as possible, provide ample supplies of product to fill the needs of the master distributor. In addition, Sullivan testified that, as a matter of industry practice, the duration of the brewer/master distributor relationship "lasts so long as both parties are satisfied that the arrangement is working in their best interests."

■ Our independent review of the trial evidence, as summarized above, leads us to conclude that, as a matter of law, no agreement—oral or written—existed. At the outset, it is important to sort out those questions that are not at issue here. There is no question that Best is now, and was when this action was commenced, a "master distributor" or "master wholesaler" of Falstaff products for the Mid–Atlantic United States region. Moreover, Best's characterization of the nature of a master distributor/brewer relationship is not in dispute to the extent that it involves the following: 1) the brewer supplies the master with product for resale in its assigned territory, 2) the master employs its best efforts to promote sales and to distribute the product, 3) the brewer charges the master prices for the product for resale in the master's territory that are lower than prices charged to non-master wholesalers or retailers within the master's territory, and 4) the master/brewer relationship lasts as long as the master orders the product or until he fails to perform on his sales.

The sole question presented here is whether Best presented sufficient proof at trial to establish that Falstaff was *contractually bound* to appoint Best as its master distributor, and, as part of that agreement, Falstaff obligated itself 1) to charge Best the same or lower prices for product than it charged to its other master distributors "in the East," 2) to not appoint a "dual master" within Best's assigned territory, 3) to provide Best with promotional allowances and advertising support, 4) to maintain its brewing operations at Fort Wayne, rather than at San Antonio, and 5) to not introduce through a related entity, Pabst, a potentially competing brand, i.e., Randersacken.

Clearly, none of the terms of the agreement alleged to exist by Best appear on the

face of any of the documents that Best claimed to constitute its agreement with Falstaff. In fact, those documents, standing alone, cannot constitute an agreement. They contain no representations or promises relating to price—let alone a promise to charge a price no higher than that charged to Falstaff's other master distributors. They do not indicate the quantity of products to be supplied or purchased. Finally, they do not indicate the duration of the appointment. The documents simply do not contain the various essential terms necessary to create a binding agreement, and thus cannot establish an agreement according to the terms alleged by Best.

Best's reliance on the March 31, 1983 letter to establish Falstaff's alleged promise to give Best "the lowest prices in the East" is misplaced. A facial review of that letter demonstrates that it cannot support a claim that Falstaff *agreed* to give Best prices lower than, or equal to, prices charged to its other master distributors because it contains no words reflecting any promise or contractual commitment made by Falstaff. Rather, the letter appears to state the pre-existing fact that Best was receiving the lowest prices on Falstaff products for resale in its Eastern territory. Moreover, even if we were to accept Lincoln's remarks in the letter as a specific contractual commitment—or perhaps a reaffirmation of a pre-existing agreement—there still would be no breach of that promise when Falstaff charged Best higher prices than it charged Southland since Southland conducts its business in the South, not in the East.

Finally, after reviewing David Tye's testimony, we find that it only reflected the terms upon which Best *wanted* an agreement, but in no way established that the parties actually agreed upon the various and specific terms alleged by Best. We therefore conclude that, on the basis of the evidence presented at trial, no "meeting of the minds" ever occurred as to the specific terms alleged, and we hold that Best failed to present sufficient evidence at trial from which a reasonable juror could have concluded that an enforceable agreement existed. We note that Best's evidence regarding industry practice and custom may have been potentially relevant to ascertain the meaning of indefinite terms, or to supply missing terms, in a pre-existing agreement, but it cannot be used as a substitute for proof of actual agreement on the several, specific terms alleged. We therefore conclude that the jury's verdict cannot stand.

## CONCLUSION

In light of the foregoing, we hereby vacate the judgment entered in favor of Best on both the antitrust and contract claims, and remand the case for entry of judgment in favor of Falstaff and Pearl. Moreover, it is also appropriate that we vacate the permanent injunction entered against Falstaff and Pearl since it no longer is based upon violations of statutory or contractual obligations.

Reversed.